**KAKER v. PARRISH.  (No. 8372.)[*]**

(Court of Civil Appeals of Texas. Ft. Worth. May 6, 1916. Rehearing Denied June 3, 1916.)

1. BREACH OF MARRIAGE PROMISE &⟶23—SUFFICIENCY OF EVIDENCE.

Evidence in a suit for damages for the breach of a promise of marriage *held* to sustain a finding that there had been a contract of marriage as alleged.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. §§ 31, 37; Dec. Dig. &⟶23.]

2. BREACH OF MARRIAGE PROMISE &⟶23—SUFFICIENCY OF EVIDENCE — RESCISSION OR ABANDONMENT.

Evidence in a suit for damages for the breach of a promise of marriage *held* to sustain a finding that the contract had not been mutually rescinded or abandoned.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. §§ 31, 37; Dec. Dig. &⟶23.]

3. BREACH OF MARRIAGE PROMISE &⟶34—RELEASE—WORDS.

The fact that plaintiff in a suit for the breach of a promise to marry, in answer to the defendant's statements that he did not know that he would "ever marry," and "that his affection for the plaintiff was not what it had been formerly," had replied, "Well, we just as well quit then," did not, as matter of law, amount to a waiver or surrender of her rights under the promise; as she was not required, in order to preserve such rights, to then insist on its performance and again express her willingness to perform her part of the contract.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. § 50; Dec. Dig. &⟶34.]

4. NEW TRIAL &⟶44(3)—MISCONDUCT OF JUROR—STATEMENT AS TO DEFENDANT.

In an action for damages for breach of a promise to marry, where it appeared that defendant had told plaintiff that he wanted to leave the country, that he was afraid to marry her, and that he had been intimate with two other women, the statement of a juror to the jury that he thought that defendant was the man who had ruined a girl and had been forced to marry her was not so prejudicial as to make the refusal of a new trial on that ground an abuse of its discretion, especially when made after the jury had agreed to find for the plaintiff on the issue of the breach, and where the verdict was not attacked as being excessive.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 82–84; Dec. Dig. &⟶44(3).]

5. NEW TRIAL &⟶52—MISCONDUCT OF JURY—VERDICT BY LOT.

The fact that it was suggested by a juror that they find the amount of damages against defendant by dividing the amount which each juror was in favor of assessing by 12, resulting in a verdict substantially for the amount awarded, where there had been no agreement to abide by such verdict, and the calculation was several hours before the final verdict was agreed upon, was not such misconduct as to make a denial

of a new trial on that ground an abuse of discretion.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. § 101; Dec. Dig. ⚖⟶52.]

**6. NEW TRIAL ⚖⟶44(3)—MISCONDUCT OF JURY—DAMAGES—ATTORNEY'S FEES.**

In an action for breach of promise to marry, where defendant's counsel had stated that the plaintiff's lawyers would doubtless get a large share of the damages, that the jury discussed how much plaintiff would have to pay as lawyer's fees and expenses, in the absence of anything to show that such items were included in the damages, and the fact that a juror followed the law of another state in assessing damages, though he was not ultimately controlled by it and did not communicate it to the other jurors, was not such misconduct as made the trial court's refusal of a new trial an abuse of its discretion.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 82–84; Dec. Dig. ⚖⟶44(3).]

**7. NEW TRIAL ⚖⟶143(2)—MISCONDUCT OF JURORS—STATUTE—BURDEN OF PROOF.**

Under Vernon's Sayles' Ann. Civ. St. 1914, art. 2021, which, contrary to the rule of the common law, authorizes a consideration of the testimony of jurors for the purpose of impeaching their verdict, a litigant, seeking to disturb a verdict against him, has the burden of showing, not only that the matters of·which he complains amount to misconduct on the part of the jury, but also that they operated to his prejudice.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 292, 293; Dec. Dig. ⚖⟶143(2).]

**8. APPEAL AND ERROR ⚖⟶978(3)—DISCRETION OF TRIAL COURT—IMPEACHMENT OF VERDICT.**

Under such statute expressly committing the determination of questions as to the misconduct of jurors to the discretion of the trial court, its discretion is reviewable on appeal, but its action in overruling the motion for new trial on the ground of the jury's misconduct will not be disturbed where it seems that it acted fairly in its investigation.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3870; Dec. Dig. ⚖⟶978(3).]

**9. BREACH OF MARRIAGE PROMISE ⚖⟶22—EVIDENCE—CHARACTER.**

In an action for damages for breach of promise, where there was no attack upon the character of the defendant's present wife, evidence for defendant that her general character was above suspicion was inadmissible.

[Ed. Note.—For other cases, see Breach of Marriage Promise, Cent. Dig. §§ 31–36; Dec. Dig. ⚖⟶22.]

Appeal from District Court, Wise County; F. O. McKinsey, Judge.

Suit by Miss Lee Parrish against Lawson Kaker for the breach of a promise of marriage. Judgment for plaintiff, and defendant appeals. Affirmed.

R. E. Carswell, of Decatur, Sam Shadle, of Weatherford, and L. D. Ratliff, of Decatur, for appellant. McMurray & Gettys, of Decatur, and H. E. Lobdell, of Bridgeport, for appellee.

CONNER, C. J. Miss Lee Parrish instituted this suit against Lawson Kaker to recover damages for the breach of a promise of marriage. The plaintiff alleged that the mutual agreement to marry was made during the year 1912 and was breached about February 15, 1915. The defendant denied the allegation of a marriage contract, and specially pleaded that, if any agreement of marriage had ever been entered into, it was by mutual consent rescinded and abandoned on about December 25, 1914. He further pleaded that after such agreement of marriage, if one was made, he learned that the plaintiff was a confirmed user of snuff, which habit was very distasteful to him, that he requested plaintiff to abandon the habit, which she had agreed to do, but that, notwithstanding such promise, she persisted in the use of snuff, by reason of which he concluded that marriage with such a person would not be pleasant, and hence on that account that he was justified in refusing to marry her.

The trial was before a jury, with instruction on the part of the court that, in event the jury should fail to find that there had been a contract of marriage, as alleged by plaintiff, they should find for the defendant. The jury were further instructed that, if they believed that such a contract had been entered into, but that thereafter it had been mutually abandoned, their verdict should be for the defendant, and further, that if they should find that the plaintiff and defendant became mutually engaged to marry, but that before said engagement the plaintiff was addicted to the use of snuff, and that the fact was unknown to the defendant, and should further believe that the plaintiff persisted in the habit over the defendant's objection after it became known to him, and that by reason of such continuance of the use of snuff the defendant broke his engagement, and that in so doing he acted as a person of ordinary temper, prudence, and foresight would have acted under like circumstances, then also they should find for the defendant. The trial resulted in a verdict and judgment in favor of the plaintiff for the sum of $5,333, and the defendant has appealed.

[1] Contrary to appellant's first contention, we think there can be no doubt of the sufficiency of the evidence to sustain the verdict and judgment on the issue of an agreement of marriage. The appellee testified, among other things:

"We were engaged to be married. We became engaged about the middle of 1912, I suppose. * * * He and I became engaged to marry about six months after he began going with me. That would be right along I suppose about the middle of 1912. * * * I do not remember just the words he used. I accepted the proposal. I do not know that I can give the substance of the words he used any nearer than I have. He wanted to know if I would marry him, and I said I would."

The plaintiff further testified to numerous visits on the part of defendant, and to numerous conversations in which reference was made to their engagement, to the character of house they would occupy, etc. The defendant did not deny these conversations, and, among other things, testified:

"If I ever agreed to marry Miss Parrish, it was conditionally. Q. She had no condition in

the world? A. Yes; if she had quit dipping snuff. * * * Q. Would you have married her if she had quit dipping snuff? A. Well, of course, I don't know. Q. On the night of the 24th of December, when you went there and found that toothbrush, if you had not found it, and she had been faithful, would you have married her? A. I don't know about that. I loved her a good deal better when I promised her, if I promised her at all, than I did when I quit. I told her in the fall of 1914 my affections was not for her what they had been. I don't know why. They just was not."

The plaintiff also introduced a number of letters written by the defendant and received by her. These letters breathe the spirit of a man making the effort to win the love of a woman. We will quote but a few of them. For instance on February 21, 1912, the defendant wrote to the plaintiff as follows:

"I am here meditating on affairs pertaining to future happiness. I do not feel like I could be altogether pleased unless you should decide to accept my love and fix your determination and surrender your affections to me; if this is done, I will be painstaking and make your life on my part as near as you desire it to be."

On February 27, 1912, the defendant again wrote:

"I have studied your nature very carefully, and find you to be a lady whom my heart yearns for, and truly believe if you should permit yourself to fall in love with me I shall always treat you in a manner that you will not regret that you surrendered your love to me."

On March 29, 1912, the defendant wrote, in part, as follows:

"Dear Lee: It is needless for any one but you to apply for my love. The last few remarks you made on last night aroused my feelings for you to such a great extent that I could not sleep for several hours after retiring. I thought delightfully of the many good things that might fall in our pathway if we should be permitted to join the ranks of matrimony."

After a number of other letters the defendant again wrote on December 7, 1912, in part, as follows:

"I feel very much gratified over the results of my undertaking; it doesn't seem to me that any one could take you from me although I may be too sure. While I am writing you I have my thoughts concentrated upon you and your future happiness. I can see your image standing in the midst of beautiful surroundings realizing that your strong intellectual power enables you to comprehend the meaning of everything pertaining to love and happiness set apart for every married person who wish to enjoy themselves, and that is what we are looking for."

On January 11, 1913, the defendant wrote, in part:

"I wish it was possible for me to be with you as much as I am away from you, then this life would be differently spent. However, the condition will not permit such a thing at present. I think when we are united we will enjoy ourselves the better trying to gain what we lost in the past."

On April 10, 1913, the defendant again wrote, in part:

"I believe if we are permitted to spend a married life together it will be so remarkable that our friends and relatives will place us in the foremost ranks of kind, true, and permanent lovers, and I assure you that there could be no greater compliment passed on me than to hear that I was true to the one that I had promised to love the remainder of my life."

On November 19, 1913, the defendant again wrote, in part:

"When I am absent from you it seems·as though I cannot find anything that will relieve me of that miserable feeling which I have and often times think that my happiness will be. incomplete until we are married; my love for you is continuously increasing, and feel positive that you love me equally as well, and for that reason I think our future happiness will be just what we are expecting it to be."

Appellant's first assignment of error is accordingly overruled.

[2, 3] Appellant next contends that:

"The evidence by overwhelming preponderance shows that whatever negotiations or arrangements looked to a marriage between appellee and appellant were rescinded and abandoned on December 25, 1914, and that the verdict of the jury upon that issue is clearly against and unsupported by the evidence, and it clearly appears that such verdict was influenced and produced by prejudice and undue and improper influence."

This contention is predicated mainly upon the testimony of the defendant to the effect:

That some time in January, 1913, he ascertained that Miss Parrish dipped snuff, which upon inquiry she did not deny, but stated that she used it only occasionally; that he told her if she continued the practice their courtship was at an end, and she finally agreed to quit; that again about the first of the year 1914 "I asked her when she took a dip of snuff, and she said, 'This morning.' I said, 'That is a nice way of quitting—continue keeping it up.' Well, she agreed again, and says, 'Well if nothing else will please you, I will quit.' Then December 25, last year, 1914, last Christmas, that was the third time. We first sat down in the parlor. We didn't have any stove there, and we went into the room where they had a stove. After we had been in there a little bit I discovered a toothbrush with snuff on it lying on the table. It was thoroughly saturated with snuff. I told her, 'I have put you to a thorough test, and think it is best for our courtship to end.' She said, 'All right; if that pleases you it pleases me.' I really do not remember everything that occurred there that afternoon. I made her a present that Christmas. I gave her—I took a lavalliere and a ruby ring and told her she might select one of them. For some little time she could not decide what she wanted, and later she decided to take the lavalliere. She took this lavalliere prior to the time I rounded her up about dipping snuff. After the incident about the snuff she just handed me back the lavalliere. I asked her to keep it as a friendly gift. She says, 'No; if our courtship is at an end I don't want you to be to any more expense,' and gave it back to me. * * * She told me she had a laundry bag almost finished; she would like me to accept that. I told her I would not do it. I considered my relations with her were at an end, and we agreed that afternoon we would quit and neither of us make any unkind, remarks about the other. We agreed to be friends, and she had a school about six miles west of Bridgeport, road very rough, and I told her if it suited her she could come in when she wanted to and I would take her back to her school. I did that twice; made two trips. There was no further intercourse between us with reference to matrimony. Up to that time I did not think she and I had reached any definite agreement to marry. I never reached any definite agreement with her to marry. I was still investigating to see whether she would suit me for a wife. * * * I don't know that the toothbrush was what finally decided it; yes, really it was. It is a fact that right then I was engaged to my present wife. I think I had been engaged to her about three or four months at that time. I·intended to marry

my present wife; that is, if we suited each other."

Miss Parrish testified, among other things, that:

"Mr. Kaker came to see me last on the 15th of February, 1915. At that time he and I did not cancel our engagement. I had not agreed up to that time to release him. I expected up to that time he was going to carry out his agreement. I did not know that he was not going to carry out his agreement to marry me until I knew that he was married. Before that time I had never agreed to release him. I do not remember seeing the defendant on the 24th of December, 1914. I saw him on the 25th. I did not agree at that time nor at any time to release him. He did not ask me to release him at any time. * * * On Christmas Day, 1914, Mr. Kaker and I had a conversation. * * * He had made me some presents, and I kept them a while. I gave them back to him about an hour after he gave them to me. He gave me a lavalliere; nothing else. I made him a present of a laundry bag. I have the laundry bag. He did not receive it. That occurred on the 25th day of December, Christmas Day. I do not know what was the matter between him and me then. There was not anything particular on my part. He made the remark just after he got there— He brought a ring and a lavalliere both, for me to select the one I preferred, and I took the lavalliere, and so after awhile—I guess about an hour after he had done it—he seemed to be upset about something, I didnt know what. I didn't know at the time; I suppose I have found out later; and he remarked that, along about the first of the conversation, that a married woman was giving him trouble, crossing his trail, or something like that, I don't remember just exactly the remark, and then he made the remark, not at that time, but in the conversation, that his affections for me were not what they once were. I says, 'Well, why didn't you tell me this?' 'Well,' he says, 'we ought to have married.' I says, 'Why didn't you do it?' 'Well,' he says, 'We were afraid we would disappoint—' I said that their disappointment would not be as great as ours. So we talked along awhile, and then directly he says, 'Well I don't know that I will ever marry; I haven't come up according to the terms; I have been intimate with two women.' I says, 'Well, we just as well quit then,' and I took off the lavalliere and gave it to him, and he told me, 'You keep this.' I says, 'No; I don't want you to spend your money on me.' He says, 'Well, I rather spend it on you than any one else.' But he took the lavalliere back, and then it was about 5 o'clock then, that evening, I had never presented the laundry bag to him, it was about 5 o'clock that evening when I presented it, and, of course, he refused to take it because I had not taken the lavalliere; and then on Sunday—he was back again Sunday afternoon, and I made the remark to him if he would accept the laundry bag I would accept the lavalliere. He said he didn't know whether he could get it then or not, as they were either selling out fast or nearly all gone, I don't remember just which remark he made, when he got this one. I told him that did not make any difference to me; I was not tired of my locket, anyway; I did not particularly care about the lavalliere. Mr. Kaker and I were together that day all the afternoon. * * * I said, 'We better quit.' He did not say anything to that right then. About the time I said that, I just suggested we just as well quit then, and I took off the lavalliere and gave it to him, and he remarked to me to keep it, and I told him I didn't want him spending his money on me. He did not say anything about quitting. He remarked something during the afternoon about, 'Well, we will still be friends.' I agreed to that. * * * On the 25th of De-

cember, 1914, nothing was said between Mr. Kaker and me about my dipping snuff. It is not a fact that he found a toothbrush of mine filled with snuff, and that he taxed me about it. Nothing of that sort occurred. * * * He kept telling me all along not to give up hopes. That was after the lavalliere matter on the 25th of December. This was the latter part of January. Mr. Lawson Kaker came to see me just as regularly after Christmas as he ever did before. Nothing was said after that about severing our relations. We continued to talk about marrying just the same as before. There was nothing in Mr. Kaker's conversation or demeanor up to the 15th of February to lead me to the suspicion that he had abandoned the idea of marrying me as he had promised. He married on the 25th of February, 1915. * * * Up until about the 15th of February he came to see me quite often. In that conversation the last of January when he spoke about going away and that he had a good notion to go where he would never be heard of, and I says, 'Won't I hear from you?' and he made the remark, 'Yes,' but I would not be allowed to tell, and no telling how long he would have to stay. I made the remark I would be willing to wait for him ten years if it was necessary. He did not say anything to that. * * * He told me about being in trouble and wanted me to help him, and then I proposed marrying him. He said that if he married he was afraid he would get his head shot off. That is the time he told me he was thinking about leaving. * * * That was at the January meeting. The next time I met him was the next week, I guess. I am certain that I never came home without seeing him, what time I was there, and, as I said a while ago, I came home every week except one. I lived about 400 or 500 yards, I guess, from where Mr. Lawson Kaker lived in Bridgeport. I never failed to see him when I came home from my school. I gave up my school after the first week in February and stayed at home in Bridgeport. * * * Q. I am trying to get at what passed between you at this February meeting, Friday in the first week in February. What did he say then about his troubles? A. Well, that is a delicate subject to undertake. He told me all about his troubles. He made the remark at three different times about going and in one remark he said I would hear from him again. He still expressed the hope that everything would come out all right; that he and I would marry. * * * We had another meeting before the 15th of February and that was the following Friday night. * * * Then the same subject was principally up for discussion about his troubles. He remarked that night not to give up hopes, everything would come out all right. I still expected to marry him. I knew nothing about his engagement to Mrs. Bailey."

Mrs. Bailey is the lady whom the evidence shows the defendant married on the 25th of February, 1915. .

We are unable to say that the testimony as a matter of law required a finding on the part of the jury that the engagement between the plaintiff and the defendant was mutually canceled. The plaintiff herself is specific in her denial that such was the case, and these denials are not necessarily shown to be false merely because, in answer to appellant's statements on December 25, 1914, that he did not know that he would "ever marry," and "that his affection for the plaintiff was not what it had been formerly," plaintiff replied, "Well, we just as well quit then," and returned the lavalliere. Some such expression and some manifestation of resentment on the plaintiff's part was under the circumstances

not unnatural, and the defendant's continued association with the plaintiff and his assurances to her thereafter all seem inconsistent with the theory that there was any mutual agreement to rescind the contract of marriage as established in the testimony of the plaintiff. In the case of Fisher v. Barber, 62 Tex. Civ. App. 34, 130 S. W. 872, in which a writ of error was refused by our Supreme Court, it appears that the defendant relied, in part at least, upon an alleged rescission or abandonment of a contract of marriage theretofore entered into between the parties. The defendant testified that upon a date mentioned he sent the plaintiff word by one Epperson that he, the defendant, would have to withdraw his offer of marriage on account of the opposition of his children, and that in response to the plaintiff's request communicated to him by Epperson he went to see her that night and told her of the opposition of his children to their marriage, and that on that account he could not marry her; that when he told her this she replied "that she was sorry, and it was what she expected." Epperson testified that when he delivered defendant's message to the plaintiff, she replied: "All right; just as I expected." The court in disposing of the testimony held that the issue of a release by the plaintiff or a cancellation of the contract of marriage by mutual agreement was not raised by the evidence. It was said:

"The defendant did not ask the plaintiff to agree to a cancellation of the contract. He sent Epperson to her, not to obtain a consent to the abandonment of the contract, but to inform her that he had determined not to marry her, and to tell her why he could not carry out his agreement with her. When she received this information she was not required, in order to preserve her right under the contract, to insist on its performance by the defendant, and again express willingness to perform her part of it. Her statement to Epperson that 'it is all right' and that 'she expected it,' not having been made in response to any request by defendant for a cancellation of the contract, cannot be treated as an agreement on her part that the contract should be canceled. * * * It cannot be expected that a woman upon the receipt of a message of this kind would not attempt to hide from the messenger her feelings of regret and humiliation, or that she would insist upon defendant's carrying out his contract with her, and plaintiff's statements to Epperson before set out can only be regarded as expressions made for the purpose of hiding her feelings of wounded pride. * * * There is no intimation in any of the testimony that, if she had pleaded with defendant to reconsider his determination to abandon her, he would not have refused to marry her. On the contrary, he had ample opportunity to reconsider and to offer to perform his contract after he knew she was not willing to release him, and yet he made no such offer. It is also clear that nothing said by plaintiff to Epperson or to the defendant could be given the effect of a release by her of the damages caused her by defendant's breach of his contract. If the statements made by her or her conduct on the occasions mentioned could be construed as evidencing an intention on her part to release her claim for damages, such release could not be held binding, because it was wholly without consideration."

The latter part of the court's remarks would seem to have application here; for here, as in the case cited, it cannot be pretended that the evidence authorizes the conclusion that the plaintiff waived or surrendered her right to the damages otherwise established in the evidence. In the case of Ortiz v. Navarro, 10 Tex. Civ. App. 195, 30 S. W. 581, a breach of promise case in which a writ of error was denied by our Supreme Court, it was said, among other things, quoting from one of the headnotes:

"Evidence of the return by plaintiff to defendant of his ring and letters does not show, as matter of law, that she had released him from his promise."

See, also, Folz v. Wagner, 24 Ind. App. 694, 57 N. E. 564; 5 Cyc. p. 1017, par. E.

We accordingly overrule appellant's second assignment of error.

[4-8] By several assignments of error appellant attacks the verdict on the ground of misconduct on the part of the jury. We will attempt to group and briefly present these several complaints together. It appears, in substance, that during the deliberations of the jury, and while discussing a part of Miss Parrish's testimony to the effect that the defendant on the occasion named told her as a reason why he wanted to leave the country that he was afraid to marry her, etc., that "he was in trouble," that "he had been intimate with two women," "that he was afraid he would get his head shot off," that getting into trouble with that other woman was nothing compared with this, it was just like going into hell this one," etc., one of the jurors remarked that, "We were in the dark about the former troubles of the defendant," to which another juryman, Jim Deaton, replied that he thought he (defendant) was the young man "that ruined Mr. X.'s daughter"; that he "probably was the man that was forced to marry X.'s daughter." The juror Jim Deaton testified, "I never said for sure that he was the man that done that, but that I thought he was the man that done that meanness," "that he said nothing more about it," and at the time remarked, "That has nothing to do with the case." It further appears in this connection that all of the jurors testified that the remarks of the juror Deaton above indicated had no effect on the verdict. It also further appears that at the time of these remarks and of this discussion the jurors had all agreed upon a finding against the defendant on the issue of liability.

A further complaint is that the verdict of the jury was arrived at by lot, but the evidence of the jurors on this subject so plainly shows that there was no agreement to abide by such verdict that we will not set out the testimony. The testimony amounts to no more than that during the deliberations among the high men on the jury and the low men that one or two of them suggested that they ascertain the amount which each juror was in favor of assessing as damages, divide

it by 12, and see what the result would be. This, it appears, was done, and the result amounted substantially to the sum finally found by the jury. The testimony, however, shows that this calculation was several hours before the final verdict was agreed upon, and, as stated, all of the jurors testified that there was no agreement to be bound by any such computation.

A further complaint is that the supposed amount of attorney's fees that plaintiff would be required to pay was included in the amount of the verdict returned. While the evidence shows that "something was said in the jury room about how much the plaintiff would have to pay as lawyer's fees and expenses," we think the evidence as a whole shows that nothing for these items was included in the verdict, and that the remarks were given no substantial effect. Moreover, the trial judge, in qualifying the bill of exception presenting this complaint, states that:

"It is probable that one of the counsel for defendant was to some extent responsible for the jury discussing the matter of attorney's fees. He stated to the jury in his argument, in substance, that he did not know what part of the $50,000 plaintiff was asking for the lawyers would get, but that doubtless they would get a large share of it, and that plaintiff was asking them to give her this enormous sum for 'heart balm and attorney's fees.'"

Another complaint is predicated upon the affidavit of one of the jurors that in the assessment of damages he "followed the law of Illinois." It appears that the juror understood that by the law of Illinois upon proof of a breach of promise to marry the damages to be assessed should be one-half of the proven estate of the defendant. In this case it had been proven that the estate of the defendant amounted to some $18,000, and the juror in the beginning was in favor of a verdict for $8,000 damages. It, however, further appears that this conception of the juror was not communicated to the others, and that he was not ultimately controlled by it, as evidenced by the fact that he agreed to a considerably less sum. At most, the matter, as it seems to us, merely indicates a want of sufficient qualification that should have been developed in the voir dire examination.

The testimony relating to the several subjects above mentioned is too voluminous to wholly embody in this opinion, but it has all nevertheless been carefully considered, together with the judge's qualification of the bill of exceptions which sets out the testimony, and it is to be remembered that our statute (Vernon's Sayles' Texas Civil Statutes, art. 2021) which authorizes a consideration of the testimony of jurors for the purpose of impeaching their verdict is contrary to the rule of the common law, and hence that a litigant so asking to disturb a verdict against him has the burden of showing, not only that the matters of which he complains amount to misconduct on the part of the jury, but also that the same operated to his prejudice. San Antonio Traction Co. v. Cassanova, 154 S. W. 1190, and cases therein cited. It is also to be remembered that the statute expressly commits the determination of such questions to the "discretion" of the trial court, and, while such discretion is reviewable on appeal, his action in overruling the motion for a new trial on the ground of misconduct of the jury will not be disturbed when it seems that the trial judge acted fairly in the investigation. See Railway Co. v. Gray, 105 Tex. 42, 143 S. W. 606.

The remarks of the juror Jim Deaton present, perhaps, the most difficult question in this connection, but no prejudicial inference that could have been drawn from the remarks of the juror Deaton is more forceful than the statements of appellant himself, as testified to by Miss Parrish, and which the jury had the right to consider. As already indicated, Miss Parrish testified that defendant told her "all about his troubles"; "that he had been intimate with two women;" "that he was afraid he would get his head shot off;" "that getting into trouble with that other woman was nothing compared with this, it was just like going into hell this one." If the jury believed Miss Parrish in so testifying, as they had the right to do under the law, then it could not be misconduct on the part of the jury to infer that the defendant on former occasions had wronged some women other than the plaintiff, and that the juror Deaton may have thought it was X.'s daughter is wholly immaterial so far as disclosed in appellant's brief. If any one or more of the jury knew either X. or his daughter, it has not been made to appear. Moreover, the remarks of the juror Deaton, as has already been stated, occurred after there had been an agreement on the part of the jury to find for the plaintiff on the issue of a breach of the marriage contract, so that it affirmatively appears that the remarks could not, and did not, operate to appellant's prejudice on that issue. It may also be stated that appellant has not attacked the verdict on the ground that it is excessive, and nothing in the evidence indicates to us that it is so, or that the amount of damages as found by the jury was in any way augmented by reason of any prejudice or improper motive on the part of the jury. So that, in addition to the denials of the jurymen, it affirmatively appears, as it seems to us, that the several matters complained of occurring in the jury room did not operate to appellant's prejudice, in the legal sense of that term. We cannot, therefore, say that the trial court abused the discretion vested in him by law in overruling appellant's motion for a new trial on the several grounds indicated. Appellant's third, fourth, fifth, and sixth assignments of error are accordingly overruled.

[9] But one other question is raised, and that is presented in appellant's seventh assignment of error. Therein complaint is

made of the exclusion of the testimony of John Slover, by whom appellant offered to show, and could have shown, that the "general character as a lady" of appellant's present wife, formerly Mrs. Bailey, was "above suspicion." We find nothing in the evidence which constitutes the exclusion of the testimony of Slover prejudicial. Appellant offered his wife as a witness in his behalf, and she testified, among other things, without objection:

That she had never met Mr. Kaker until in April, 1913; that "he began paying attention to me about the 28th of April, 1913. Mr. Kaker was always perfectly gentlemanly in his conduct with me. He married me voluntarily. There was no circumstance of compulsion on my part which caused him to marry me. Nothing in my association with him that made it necessary for him to marry me if he did not voluntarily want to."

Nothing in all of the testimony, as we consider it, tends to refute the truth of the statement as so made by Mrs. Kaker. No attack, as we view the evidence, of any kind was made upon her character in any respect, and counsel for appellee so avowed at the time Slover's testimony was offered. In the absence of some reasonably definite attack, we think the court properly excluded the testimony as immaterial.

All assignments of error are accordingly overruled, and the judgment is affirmed.