**STEVENS v. DAWLEY et al.   (No. 2167.)** *

(Court of Civil Appeals of Texas. Amarillo. June 20, 1923. Rehearing Denied Oct. 10, 1923.)

**1. Appeal and error ⚖⇒978(3)—Misconduct of juror held to justify reversal of order denying new trial.**

Where, in an action for fraud and conspiracy, after the jury had voted seven to five for the plaintiff, one juror disclosed information obtained from outside sources, upholding the reputation of one defendant for good faith and one juror on plaintiff's motion for new trial testified to having been influenced by the information, eight others, though denying influence, failing to satisfactorily explain their change of mind, the court erred in refusing a new trial, and, though the misconduct was thoroughly investigated and the offending juryman punished, the case will be reversed and new trial granted under Vernon's Sayles' Ann. Civ. St. 1914, art. 2021, directing judicial hearings in such cases and making new trials discretionary where the misconduct proves material.

**2. Appeal and error ⚖⇒978(3)—Test for determining whether jury was improperly influenced by improper communications of fellow juror stated.**

On motion for new trial on the ground of misconduct of the jury, denials by members of the jury that they were influenced are not conclusive, but, the communication being such as leaves the question of influence doubtful, denial

---

of a new trial should be reversed, within Vernon's Sayles' Ann. Civ. St. 1914, art. 2021, directing an investigation in such cases and making new trials discretionary where the misconduct proves material.

**3. Appeal and error ⬦⬦638—Statement of facts not substantially complying with rules and statutes disregarded.**

A statement of facts prepared for appeal, so clumsily put together that it did not even substantially comply with statutes including Vernon's Sayles' Ann. Civ. St. 1914, arts. 1924, 1925, and 2070, and court rules regulating its form, will be entirely disregarded.

**4. Appeal and error ⬦⬦673(3)—Appeal disregarded in view of defective statement of facts and pleadings.**

In an action for fraud and conspiracy, a contention on appeal as to ruling on plea of res adjudicata will be disregarded where the submitted statement of facts does not substantially comply with court rules and statutes, the record containing no order overruling his plea or exception.

**5. Appeal and error ⬦⬦671(1)—Chaotic condition of record held to justify refusal to consider sufficiency of evidence.**

Issues presented by the briefs relating entirely to sufficiency and insufficiency of evidence as bearing upon the court's direction of verdicts for certain defendants, *held* not considered in view of the chaotic condition of the record and statement of facts.

Appeal from District Court, Wichita County; P. A. Martin, Judge.

Suit by M. E. Stevens, as trustee in bankruptcy of the Marigold Oil & Refining Company of Texas, against G. W. Dawley and others. From a judgment for defendants and an order denying a new trial, plaintiff appeals. Reversed and remanded.

W. B. Chauncey and Bullington, Boone, Humphrey & Hoffman, all of Wichita Falls, for appellant.

W. L. Scott, T. F. Hunter, and Kay Akin & Kenley, all of Wichita Falls, and William J. Dawley, of New York City, for appellees.

HALL, C. J. The oil and gas interest in a certain four acres of land in Wichita county, in block 74, Northwest Field, was owned in the following proportions: Three-eighths by Joseph and M. O. Danciger; 9/32 by the Marigold Oil & Refining Company, a Delaware corporation; 3/32 by E. D. Davenport; an overriding ⅛ royalty by J. P. Barkley and the Kansas & Gulf Company; the remaining ⅛ being the fee owner's royalty. On the 30th day of August, 1919, G. W. Dawley and E. D. Davenport entered into a contract whereby Dawley, by complying with the terms and conditions of the contract, should acquire the lease covering the entire four acres. A writing was entered into at that time containing numerous stipulations, which it will not be necessary to set out here. This contract was signed by E. D. Davenport, Geo. W. Dawley, and witnessed by R. W. Talbot. According to the testimony of Davenport, G. W. Dawley and W. J. Dawley the following instrument was executed at the same time:

"Agreement made this 30th day of August, 1919, between E. D. Davenport, of Wichita Falls, Texas, and Geo. W. Dawley, of Fort Worth, Texas, witnesseth: Whereas, the parties hereto have this day entered into an agreement whereby the party of the first part agreed to sell and the party of the second part agreed to purchase the oil, gas and mineral lease on a four certain acres of land therein specified in block 74 of the Red River Valley survey, Wichita county, Texas, and in said agreement it is recited that the purchase price is specified in the separate agreement executed simultaneously therewith: Now, therefore, in compliance with said agreement further witnesseth that the party of the first part agrees to sell, and the party of the second part agrees to purchase, the said property specified in the said agreement for the sum of four hundred thousand ($400,000) dollars as follows: $25,000 on or before September 10, 1919; $75,000 on or before October 1, 1919; $75,000 on or before November 1, 1919; $75,000 on or before December 1, 1919; $75,000 on or before January 1, 1919; $75,000 on or before February 1, 1919. Total $400,000. It is expressly understood and agreed that this supplemental agreement is subject to all of the terms and conditions of the aforesaid agreement executed simultaneously herewith, the object hereof being solely to specify the price and terms of the payment referred to therein. In the witness whereof the parties hereto have hereunto set their hands and seals at Wichita Falls, Texas, the day and year first above written. [Signed] E. D. Davenport. Geo. W. Dawley." Witnessed by R. W. Talbot.

There was also executed the following letter:

"Wichita Falls, October 30, 1919.
"Mr. Geo. W. Dawley, Fort Worth, Texas—Dear Sir: You have this day entered into a contract to purchase from me the oil, gas and mineral lease on the south four acres of the east nine acres of the south ten acres of the northeast quarter of block 74, Red River Valley survey, Wichita county, Texas, at an agreed price of $400,000 and as a condition of such purchase by you from me and as a consideration thereof, I have agreed and do hereby agree to repay to you ten per cent. (10%) of said purchase price, to wit: The sum of four hundred thousand ($400,000) dollars in the aggregate, the same to be repaid to you immediately upon receipt of each installment of the purchase price by me, thereupon repaying you ten per cent. (10%) thereof.
"Yours very truly, E. D. Davenport."

Soon thereafter the Marigold Oil & Refining Company of Texas became financially

involved and went into bankruptcy. The appellant Stevens, as trustee in bankruptcy, acting under the orders of the federal District Court for the Northern District of Texas, filed this suit against G. W. Dawley, W. J. Dawley, R. W. Talbot, J. M. Reynolds, H. L. Hunter, Stanley Watson, Joe Danciger, M. O. Danciger, and E. D. Davenport, to recover the sum of $140,000. He alleges, in substance, that on or about August 30, 1919, the Marigold Oil & Refining Company of Texas was then a corporation, having J. M. Reynolds as president, H. L. Hunter as vice president, and E. D. Davenport as secretary and treasurer. That the corporation owned the lease above described; that on said 30th day of August, 1919, the said Reynolds, Davenport, and Hunter, as agents of the Marigold Oil & Refining Company, conspired together to sell the property to G. W. Dawley, who at that time was practically without property or financial standing; that they did not make a bona fide contract with said Dawley, but entered into a fraudulent contract for the sale of the property to him in consideration of $400,000; that G. W. Dawley and his brother, W. J. Dawley, immediately went to New York and sold the said property for $650,000 and after said sale all of the defendants concluded that this additional $250,000 was not enough for them to make out of the property, but conceived the idea and conspired together to take an additional $100,000 and divide it between them, which was done; $15,000 to $20,000 of said amount being apportioned to Geo. W. Dawley, $15,000 or $20,000 to E. D. Davenport, $15,000 or $20,000 to Stanley Watson, $15,000 or $20,000 to R. W. Talbot, $2,500 or $3,000 to J. M. Reynolds, $500 to H. L. Hunter, and about $4,500 or $5,000 to Joe and M. O. Danciger. That in pursuance of said fraudulent conspiracy and scheme they took said money and delivered to the company only about $24,000. That all of the defendants knew that Davenport, Hunter, and Reynolds were officers of the company and acting in a fiduciary capacity, and that Joe and M. O. Danciger were partners or joint owners with the company and were acting in a fiduciary capacity; that Stanley Watson, R. W. Talbot, and W. J. and G. W. Dawley knew that said officers were acting in a fiduciary capacity, and that they were taking a "kick-back" of some $100,000 that they had made on the sale of the property; that they knew at the time they signed the pretended contract with G. W. Dawley that he was worth practically nothing, and that said money was taken from the company without the knowledge or consent of said company.

All of the defendants answered except Reynolds, Watson, and W. J. Dawley, upon whom no process had been served. The suit was dismissed as to them. G. W. Dawley answered by general demurrer, special exceptions and a plea of res judicata. Davenport and Talbot filed a lengthy special answer, setting out in detail what they contend were the true facts and full history of the transaction, which the appellant claimed to be fraudulent. M. O. and Joe Danciger filed a special answer adopting certain parts of the answer filed by Davenport and Talbot, referring to them. When the plaintiff had concluded the introduction of testimony in chief and rested, the various defendants moved the court for directed verdicts in their favor. The court granted the motions to this effect filed by M. O. Danciger and Joe Danciger and H. L. Hunter, dismissing them from the case. The motions of Davenport, Talbot, and G. W. Dawley were overruled. The court submitted the issues of fraud to the jury, as such issues related to Davenport, Talbot, and G. W. Dawley, and in response to such issues the jury found in favor of said defendants.

In reply to the first issue the jury found that none of the defendants, G. W. Dawley, Davenport or Talbot, entered into a conspiracy to defraud the Marigold Oil & Refining Company.

[1] The first contention to be considered is that the verdict was influenced, not by the evidence received during the trial, but by communications received by the jury from outsiders. While they were considering the above issue, a vote was taken several hours before the noon recess, showing that the jury stood seven to five in favor of answering the issue in the affirmative. Upon the motion for a new trial, based upon misconduct of the jury, nearly all of the jurors testified that certain information from the outside came into the jury room through one of the jurors, H. H. Hamlin. Roy Compton, one of the jurors, testified that the trial continued about nine days; that the court's charge was delivered about 9 o'clock on Saturday morning; that they considered the evidence before arriving at a verdict from that time until 3 in the afternoon; that to the best of his recollection the jury stood seven to five in favor of the plaintiff at noon; that they would discuss the matter for 30 or 40 minutes and then take a vote; that they were divided practically seven to five until 2 o'clock in the afternoon; that H. H. Hamlin was sitting at the head of the table, all the jurors were trying to talk at once, discussing whether or not the agreement of August 30th was made in good faith, when Mr. Hamlin, who was sitting close to the witness, said to him:

"Well, I am sure in my own mind, or practically sure. I talked to Mr. Watson, at the dance the other night; he kinder laughed and says, 'This is on the quiet.' I should not have talked to him, but Mr. Watson told me the deal was in good faith, and that was the chief anxiety or something to that effect—afraid the deal was going to fall through. I know if he hadn't

been afraid the deal was going to fall through would not have been made in good faith."

Compton further testified:

"Most of the jurors could have heard it. I don't know what time that was said. I was standing up. Was not taking part in the discussion; didn't look like we were going to agree, and Mr. Hamlin told of a further conversation he had on the street at noon; I didn't understand, never did catch the parties named, but I understood him to say that it was the president of some bank or the vice president. He says, 'He told me that —— asked me what case I was on, or what I was doing—told him he hung on the jury. He asked me what case, and I told him the Davenport-Marigold Case; told him the full details of it. He said the banker asked him, 'Is this our E. D. Davenport?' And he told him, 'Yes.' He says, I understood it, that Hamlin told him some of the details of the case, and he told him that—he said, 'We loaned Davenport $60,000, and he paid every dollar of it back.' I know, or practically know, in my own mind, that fellow is not guilty of any fraud."

According to Compton the foregoing is the substance of the communication given by Hamlin to the jury before the verdict was reached and during the afternoon of the day upon which it was submitted to the jury. This witness also testified that several times it was mentioned; that the court came very near throwing the case out as it was hanging by a thread; and that the jury came very near receiving an instructed verdict. He says he did not know who made that statement, or where it came from. He further testified as follows:

"I was with the seven; I voted straight with the seven; I suppose I should say that what Mr. Hamlin said did not have any effect upon me as the court instructed us not to consider anything that was not brought up in evidence, but if I may be allowed to explain, when trying to convict a man for fraud and a man like the president of the bank came in and said he paid him $60,000, and that was brought up before a jury to consider, and it was for a juror to consider, I would have to say after that I did change my vote. I cannot say for the other jurors, but the record would speak for itself, but I know after we did not take a vote, only for quit awhile, but we could tell a lot of them were changing and began to look like we were going to reach a decision, and on the first ballot after that, though we had been voting seven to five all the time, at that time voted eleven to one for the defendants and never did take another vote; the other man stuck up his hand and said, if the rest are going over, he was, too. It was about 30 minutes after this conversation that we voted."

On cross-examination this witness testified that the jury decided that the testimony was too weak to sustain the allegations of fraud and conspiracy, and that he should say that the case was decided on the evidence. During his cross-examination he testified that he had studied law, and further as to whether—

"I mean to state to the court that the bare fact that in the course of the deliberations, one of the jurors said he had heard a man say that Davenport on another occasion had borrowed $60,000 and had paid it back, was a controlling feature with me in making my verdict in this case, over and above his having paid other people at various times, I will state that I don't say it was the controlling feature, but one mere statement from a party not connected with the deal will have more influence with the jury than the testimony all day of any one of the men that is in the trial. I don't mean it would be with me. As to whether or not I am going to say that a bare, random, unsworn statement on the street would have more weight with any jury than the sworn testimony of the witness on the stand, I will state that I believe that a statement like that, or that statement there, had as much influence on that jury's decision that afternoon during their deliberations, that afternoon had as much to do with that decision, as all the testimony of any one witness that went on this stand."

According to the holding of Section A of the Commission of Appeals in Hines v. Parry, 238 S. W. 886, the trial court erred in overruling the motion for new trial. Six of the seven jurors who voted in the affirmative —that is, who believed that the facts were sufficient to show conspiracy and fraud—and three of the five who voted in the negative upon such issue, testified with reference to the issue of misconduct raised by the motion for new trial. Several said they did not hear Hamlin's statement, and all but Compton said they were not influenced by what Hamlin said. The substance of Compton's statement is that he was influenced by Hamlin's repetition of what the banker had told him (Hamlin) as to the honesty and integrity of Davenport. V. S. C. S. art. 2021, provides that where the ground of the motion for new trial is misconduct of the jury or because of any communication made to the jury, or because the jury received other testimony, the court shall hear evidence thereof, and it shall be competent to prove such facts by the jurors or others by examination in open court, and if the misconduct or the testimony received, or the communication made, be material, a new trial may, in the discretion of the court, be granted. In construing this statute, the Supreme Court said in H. & T. C. Ry. Co. v. Gray, 105 Tex. 42, 143 S. W. 606:

"After proper consideration given to the briefs furnished, we conclude that the 'discretion' expressed in the act above copied, is upon the same level with the discretion vested in the trial judge in many instances, and that we may review its exercise wherein it clearly appears that the rights of parties have been disregarded. If the evidence taken by the trial judge left it reasonably doubtful as to the effect the statement had upon the amount

of the verdict of the jury, we would feel inclined to exercise our authority and set it aside; but the judge who tried the case seems to have acted promptly and fairly in the investigation, and we know that he could form safer conclusions from examining the jurors than this court can from the record. There is much in looking at the man who testifies."

It appears that in that case one or more of the jurors stated that the plaintiff ought to have a verdict for $50,000, "because the lawyers would get half." The case of Kaker v. Parrish (Tex. Civ. App.) 187 S. W. 517 (writ of error refused) holds that the burden is upon him, who seeks to disturb the verdict, to show that the matters complained of amount to misconduct, and also that they operated to his prejudice. The Austin Court of Appeals, in Southern Traction Co. v. Wilson, 241 S. W. 636, seems to have made an exhaustive investigation of the many cases bearing upon the question under consideration. Although the misconduct charged in that case was more flagrant than that in either this or the Parry Case, and the matters shown more probably have affected the rendition of the verdict than in either this or the Parry Case, still it was held that no abuse of the trial court's discretion was shown, and the holding in the Gray Case was adhered to by the Court of Civil Appeals. A writ of error has been granted in that case, but the matter has not been passed upon by the Commission of Appeals. The case of M. K. & T. Ry. Co. v. R. G. Andrews Lumber Co. (Tex. Com. App.) 206 S. W. 823, on writ of error from the Fifth district, was considered by Justice Strong. Information had reached the jury through one of the members that an outside party had said that one of the witnesses had sworn falsely. The judgment of the Court of Appeals was reversed, and in the course of the opinion it is said:

"The statute leaves it to the discretion of the trial court to set aside a verdict for misconduct of the jury, and appellate courts are not authorized to disturb the verdict, where the trial court has refused a new trial for misconduct of the jury, unless the court has abused the discretion reposed in it by statute. * * * There is no question but that, under the statute, the exercise of the discretion of the trial judge may be reviewed, where it clearly appears that the rights of the parties have been disregarded. Railway Co. v. Gray, 105 Tex. 43, 143 S. W. 606. Whether the rights of the parties have been disregarded is, under the statute, left to the determination of the trial judge, and, unless the record shows an abuse of his discretion, appellate courts are bound by his finding. Kalteyer v. Mitchell, 102 Tex. 390, 117 S. W. 792, 132 Am. St. Rep. 889. The record does not disclose such an abuse of discretion on the part of the trial judge as to authorize a reversal of the case on this ground."

In Kalteyer v. Mitchell, 102 Tex. 390, 117 S. W. 792, 132 Am. St. Rep. 889, where only two of the jurors testified upon an issue of misconduct, one of them testified that they agreed to take a ballot, and that a majority vote should control. The other refused to testify that they agreed to be governed by a majority ballot. The remaining ten did not testify. Gaines, Chief Justice, said:

"We cannot say that the action of the court in refusing a new trial shows such an abuse of discretion as to authorize us to hold that it was error."

In the case of G. H. & S. A. Ry. v. Pingenot (Tex. Civ. App.) 142 S. W. 93, where improper matters were discussed by the jury, Fly, Justice, said:

"All the jurors questioned testified that they were not influenced in their verdict by the conversation about the matters mentioned. We do not think the district judge abused the discretion vested in him by statute in regard to granting new trials on the ground of misconduct of the jury, and, in the absence of such abuse of discretion, this court will not disturb his action. Foley v. Northrup, 47 Tex. Civ. App. 277, 105 S. W. 229. The fact that eleven of the jurors at one time insisted on a verdict of $38,000 cannot be used with any force as an argument that the jurymen were influenced, to the detriment of appellant, by the matters mentioned, because they reduced their verdict $10,000 after hearing those matters discussed. If verdicts are to be set aside on account of unfounded vagaries and impertinent conversation of jurors, none would be safe, and every trial would be followed by an arraignment and trial of the jury. The statute under which jurors are permitted to detail every trivial act and idle word in the jury room is an insatiate consumer of time and patience of courts and a prolific breeder of trouble; its only saving clause being the investiture of the trial judge with discretion in the granting of new trials on the ground of improper conduct of the jury. This court will not interfere with that discretion when soundly and reasonably exercised."

Writ of error was refused in that case. And also in the case of T. & B. V. Ry. v. Geary (Tex. Civ. App.) 194 S. W. 458, where matters not in evidence were discussed in the jury room, and where one juror, upon the hearing of the motion for new trial, stated that he had been induced to increase the amount of his vote by the discussion, yet Graves, J., affirmed the trial court's action in overruling the motion because it appeared that the trial judge had heard all the evidence from the mouths of the jurors themselves, and was better able to form an opinion than the Court of Appeals. To the same effect is the holding in Virginia F. & M. Insurance Co. v. St. Louis S. W. Ry. Co. (Tex. Civ. App.) 173 S. W. 487. In Pecos & N. T. Ry. Co. v. Coffman (Tex. Civ. App.) 160 S. W. 145, Hendricks, Justice, citing Railway Co. v. Gray, 105 Tex. 42, 143 S. W. 606, held that the trial court could, by examining and seeing the jurors, form a safer conclusion

than this court as to the effect of the misconduct. It will be seen by referring to the cases cited in the above mentioned decisions, as well as numerous decisions by Courts of Civil Appeals in this state, citing the Gray Case, that the impression has prevailed that the burden rested upon him, who attempted to impeach the verdict, to show both misconduct and prejudice to him. In the Hines v. Parry Case, 227 S. W. 339, this court followed the rule laid down by the Supreme Court in H. & T. C. Ry. Co. v. Gray, supra, and restated, in effect, by Judge Strong in the Andrews Case, and placed the laboring oar upon the complaining party. Seven of the jurors did not testify in the Hines-Parry Case, and there was no evidence one way or the other as to what effect the communication of the juror Fred Thompson had upon them. The other four jurors who did testify stated positively that his communication did not influence them in arriving at their verdict and Thompson himself says he did not consider what he had heard, and the record shows that he agreed to a $2,500 verdict when, prior to the communication that was made to him, he had voted for a $5,000 verdict. The jurors who did testify declined to give their opinion as to what effect the communication received from Fred Thompson had upon the seven jurors who did not testify. In deciding the Hines-Parry Case we proceeded upon the theory that the trial judge knew the jurors, or at least observed them, and heard them testify; that if the testimony of any of the seven jurors who did not testify would have benefited the railway company the energy, ability, and zeal of the railway company's attorneys would have produced them, and we were not willing to presume that the seven jurors not heard from had been influenced and to hold to the contrary to the sworn testimony of the other five that they had not been, and reverse the case in the face of the rule announced by the Supreme Court in the Gray Case, the Andrews Case, and a great many other decisions of the Courts of Civil Appeals in line with them. Since the decision by the Commission of Appeals, in the Hines-Parry Case, that being the last expression from the Supreme Court upon the question, we must hold that this contention presents reversible error. Although it appears that the trial judge in this case thoroughly investigated the misconduct and assessed a fine of $100 and 30 days in jail against Hamlin, and although it does not clearly appear to us, any more than it did to the trial court, that the misconduct affected the jury in the rendition of the verdict, and although there is no question of the amount of the verdict presented in this case, as there was in the Gray Case, nevertheless, under the holding in the Hines-Parry Case, the judgment will be reversed. None of the seven jurors in this case have

given any satisfactory reason for their change of position. Only three jurors were not placed upon the stand in this case, and it may be that they have been influenced as were the seven jurors in the Parry Case. Because it is said in that case, "To our minds the circumstances surrounding this jury's ultimate findings do not appear to us to be free from unwarranted influence," although the jurors testified that they were not influenced, we must hold that there was such an influence, at least as to the juror Compton.

[2] All of the jurors in this case, except Compton denied that they were influenced, but the test now laid down in the Hines-Parry Case, upon that state of facts, is as follows:

"It is true that the members of the jury who are questioned strenuously deny that their minds were affected by the statements made to them. But this is only natural. Men are slow to admit such influence in their deliberations. They may not have realized that they were being influenced.

"Feeling that the communication made was such as leaves it doubtful as to whether or not the verdict of the jury, in part at least, was not influenced against the defendant, we recommend that the judgments of the trial court and Court of Civil Appeals be reversed, and remanded for a new trial."

[3] The statement of facts comprises about 600 pages. It is not prepared in accordance with the statutes and the rules and should be entirely disregarded. The first 211 pages each have two different numbers; then beginning with page 10 the remaining pages are consecutively numbered to 357. There are two separate indices at the front of the statement, neither of which complies with rule 7a for the Courts of Civil Appeals (142 S. W. x) in that more than 100 different instruments are indexed simply as Exhibit 1, etc., without any statement showing what the exhibit is. If district and county court rules 72–78 (142 S. W. xii, xiii) had been observed, 95 per cent. of all this matter could and should have been eliminated. All through the statement half pages are pasted in, and there are erasures and interlineations made all through it with pen and pencil. It is clumsily fastened together with binder twine and paper clips and hardware. Much of it is single spaced, dimly written, and carbon copies. To the last 357 pages there is a certificate of one court reporter whose name we are unable to decipher, with an agreement of the attorneys as to the whole 600 pages. An entirely different stenographer certifies that "the foregoing pages, numbered 1 to 90, inclusive, contains a true and correct," etc., when there are 120 pages instead of 90 preceding his certificate. This is followed by about 100 pages near the center of the statement of facts, many of

them practically blank pages, purporting to contain copies of pleadings, orders, etc., signed by several district judges, together with what seems to be evidence offered, no one knows where, when, or why, because there is no certificate and no agreement of counsel, and no approval by any judge to that part of the statement. We are unable to say whether this is the original or a duplicate of any statement filed in any trial court anywhere, as it has no certificate of any district clerk. Not only is there a total disregard of the above-mentioned rules for the Courts of Civil Appeals and district courts, but the requirements of V. S. C. S. arts. 1924, 1925, and 2070, have also been ignored. By a separate paper, filed just before submission, we have what purports to be a carbon copy of possibly a pleading omitted from the transcript. There is no certificate by the district clerk that it is a copy, and nothing to show that it was ever filed in any case, in any court, at any time. It is filed here without any application for a certiorari to perfect the record. Counsel are admonished that these statutes and rules were enacted and promulgated in the interest of the orderly and expeditious dispatch of business in appellate courts and should be at least substantially complied with.

[4] Geo. W. Dawley has filed a separate brief, insisting mainly that he should have been discharged upon his plea of res judicata. We think his pleading is insufficient to entitle him to the release. On account of the defective and confusing statement of facts, as it may bear upon that issue, we are unable to express any opinion as to whether any such defense is available to him. At any rate, the record contains no order of the trial court overruling his plea, and no exception on his part to any such action of the court, nor has he filed any cross-assignment. We therefore must disregard his contention.

[5] The remaining issues presented by the briefs relate entirely to the sufficiency and insufficiency of the evidence bearing upon the court's action in peremptorily instructing the jury to find in favor of certain of the defendants. We deem it best, in view of the chaotic condition of the record and the statement of facts, not to pass upon these contentions. In filing his suit, the appellant seems to have misunderstood the facts upon which his action was based. It appears that there is a Marigold Oil & Refining Company organized under the laws of Delaware which owns an interest in the lease in question. Some of the stockholders of that company undertook to organize the Marigold Oil & Refining Company of Texas, and according to the statements of some of the stockholders it was totally insolvent and never acquired any property. At any rate, it is clear that the appellant is mistaken in his allegation that the company of which he is trustee owned the entire lease. Upon a careful consideration of the whole record, since it must be reversed, we have decided to reverse the judgment in every particular, and suggest that before another trial a repleader be ordered.

Because the court denied the motion for a new trial, the judgment is reversed, and the cause remanded.

### On Motions for Rehearing.

Upon reconsideration of the record in relation to the question of misconduct of the jury, upon which proposition the judgment was reversed, we are convinced that the record sustains the assignment, and that under the law as it now exists we are correct in reversing the judgment for that reason alone.

In view of another trial, it became the duty of the court to discuss the other matters, which was done incidentally. We concluded from the record that the Marigold Company of Delaware, and not the Marigold Company of Texas, was a part owner of the lease. If we are correct in this, then the Marigold Company of Delaware is a necessary party to the suit, and in view of these conditions we suggested the necessity of a repleader before another trial. Because the statement of facts is not so prepared and authenticated as to entitle it to consideration, we could not definitely announce a conclusion upon the other matters urged in the brief, aside from the question of misconduct of the jury. As to that contention, the record is complete, the evidence bearing upon the issue being part of the statement of facts and incorporated in the transcript. We did not consider the statement of facts further than to discuss the various defects shown.

Both motions for rehearing are overruled.