**NORTHERN TEXAS TRACTION CO. v. BRYAN. (No. 11651.)***

Court of Civil Appeals of Texas. Fort Worth.
July 2, 1927.

Rehearing Denied Oct. 1, 1927.

1. **Jury ⟨⟩66(1)—That jury panel in city of 20,000 was not selected from tax list was no ground for quashing panel (Rev. St. 1925, arts. 2094, 2095).**

That jury panel was not selected from tax list for the current year, as provided by Rev. St. 1925, arts. 2094, 2095, applicable to cities containing population of 20,000 or more, was no ground for quashing panel.

2. **Street railroads ⟨⟩110(1)—Petition alleging street car was operated at dangerous speed with defective brakes held sufficiently specific.**

In action for injuries to pedestrian struck by a street car, allegations of petition that car was being operated at a high and dangerous rate of speed, and that defendant negligently failed to provide and maintain in good working condition the brakes or other device for checking its speed, held sufficiently specific as against objection that they were too uncertain and indefinite.

3. **Appeal and error ⟨⟩1039(4)—Objection to materiality of allegation of petition must be overruled, where issue not submitted, and jury instructed to disregard issues not submitted.**

Objection that allegation in petition was immaterial must be overruled, where such issue was not submitted to jury and court in its charge specifically instructed jury to consider only the facts pertinent to the issues submitted.

4. **Appeal and error ⟨⟩1053(5)—Objection to admission of evidence not submitted to jury must be overruled.**

Objection to admission of certain evidence will be overruled, where issue raised thereby was not submitted to jury in court's charge.

5. **Street railroads ⟨⟩81(1)—Operators of street cars must exercise ordinary care to avoid injuring pedestrians.**

At least ordinary care must be exercised by the operatives of street cars to avoid injury to persons lawfully on the city streets, and failure to exercise such care which proximately results in injury constitutes negligence.

6. **Trial ⟨⟩350(6)—Submission of issue whether motorman used ordinary care to sound gong sufficiently to warn pedestrians held not error under evidence.**

In action against street railroad for injuries to pedestrian struck by car while crossing street, submission of special issue whether operator of car used ordinary care to sound his gong in such a manner as to give sufficient warning to pedestrians of its approach held not error under evidence.

---

⟨⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted December 14, 1927.

**7. Trial ⬌350(6)—Submission of special issue whether street car which struck pedestrian was operated at excessive speed held warranted by evidence.**

In action for injuries to pedestrian struck by street car, submission of special issue whether car was traveling at negligent and excessive speed *held* warranted by the evidence.

**8. Trial ⬌350(6)—Submission of special issue whether motorman kept sufficient lookout to avoid injuring pedestrians crossing street held not error.**

Submission of special issue whether street car motorman was keeping such a lookout as would have been kept by person of ordinary prudence to avoid injuring pedestrians crossing street *held* not objectionable as multifarious, on the weight of evidence, placing too great a burden on street railway on disputed issue *as to* place of crossing, or as not warranted by pleadings.

**9. Trial ⬌350(7)—In action for injuries to pedestrian struck by street car, submission of issue of discovered peril held warranted by evidence.**

In action for injuries to pedestrian struck by street car while crossing street, submission to jury of issue of discovered peril *held* not error under the evidence.

**10. Appeal and error ⬌1062(1)—Error in submitting issue of discovered peril, not warranted by evidence, would be immaterial, if judgment could be sustained on other issues.**

Even if evidence did not raise issue of discovered peril, error in submitting such issue would be immaterial, if the judgment could be sustained on other issues of negligence entitling plaintiff to recover.

**11. Trial ⬌350(7)—Submission of issue whether pedestrian was crossing at regular intersection when struck by car held not error.**

Submission of special issue whether plaintiff was crossing street at the usual crossing at intersection at right angles with curb line when struck by street car *held* not objectionable as being on weight of evidence and as suggesting that plaintiff was not crossing intersection at usual place and at right angles with curb.

**12. Trial ⬌350(7)—Submission of special issue whether plaintiff kept sufficient lookout for approaching cars in crossing street held warranted by evidence.**

In action for injury to pedestrian struck by street car, submission of special issue whether plaintiff was keeping such a lookout for approaching cars as a person of ordinary prudence would have kept under similar circumstances *held* justified under the evidence.

**13. Trial ⬌350(8)—Failure to submit requested issue whether pedestrian looked before stepping on track held not error, where she admitted she did not look.**

In action for injuries to pedestrian struck by street car, failure to submit defendant's requested issue whether plaintiff failed to look for car just prior to stepping on the track *held*

not error, where plaintiff admitted she did not look at that time.

**14. Trial ⬌194(17), 232(2)—Instruction not to answer special issue as to damages for injuries unless jurors answered other instructions in affirmative, held not objectionable as on weight of evidence and instructing as to effect of verdict.**

In action for injuries to pedestrian struck by street car, preliminary instruction not to answer special issue as to amount of damages, unless jurors answered in the affirmative certain issues determining plaintiff's right to recover, *held.* not objectionable as being on the weight of evidence, and in effect *instructing* jury as to the effect of their verdict.

**15. Trial ⬌207—Limiting effect of testimony at former trial solely to credibility of witness held not reversible error.**

Instruction limiting effect of testimony of witness given at former trial to sole purpose of passing on her credibility as a witness *held* not reversible error.

**16. Trial ⬌215—Giving instruction to consider only facts pertinent to issues submitted held not reversible error.**

In action for injuries to pedestrian struck by street car, giving of general instruction to consider only the facts pertinent to the issues submitted to jury by the instructions, and that all other evidence and allegations are withdrawn, *held* not reversible error.

**17. New trial ⬌44(1)—That jurors discussed hospital fees, doctors' bills, and other expenses, and that alleged insult to one juror influenced his verdict, held not misconduct rendering denial of new trial abuse of discretion (Rev. St. 1895, art. 1371, as amended by Laws 1905, c. 18).**

In action for injuries to pedestrian struck by street car, fact that jurors, while considering issue of damages, discussed and considered amount of hospital fees, doctors' bills, attorneys' fees, amount assessed by a former jury, and cost to plaintiff of buying a home, and that one of jurors was influenced to increase his verdict by an alleged insult by another juror, and by his anxiety to hasten his discharge, *held* not such misconduct as to make trial court's refusal of a new trial an abuse of discretion, under Rev. St. 1895, art. 1371, as amended by Laws 1905, c. 18.

**18. Witnesses ⬌255(10)—Permitting witness to testify as to speed of street car after his memory was refreshed by testimony on former trial held not error.**

Where witness for plaintiff testified on direct examination that street car which struck plaintiff was traveling about 10 or 15 miles an hour, it was not error to permit him to testify, after his memory had been refreshed by his testimony on a former trial, that car was traveling about 20 miles an hour when it struck plaintiff.

**19. Evidence ⬌89—Permitting plaintiff to show that certain witness was not summoned because he could not be found held not error.**

Permitting plaintiff in personal injury action to show that a certain witness who was present

at the accident was not summoned because he could not be found by the officer *held* not error.

**20. Street railroads ☜111(2)—Proof that, after plaintiff was struck by street car, her ankles were injured by opening of car door, held admissible under petition.**

In action for injuries to pedestrian struck by street car running at excessive speed without proper lookout, allegation in a separate paragraph of petition that, after plaintiff had been thrown under the car, motorman opened and pressed on her the door or steps, and thus injured her ankles, was not objectionable as stating another cause of action, such injuries being a part of the occurrence as a whole, and proof thereof was admissible.

**21. Evidence ☜558(11) — Refusal to permit reading of medical work in cross-examining expert witness in personal injury action held not error.**

In personal injury action, refusal to permit defendant to read from a medical work on fractures while examining plaintiff's medical expert *held* not error, where the witness in effect declined to admit that he recognized the work as an authority, and that his opinion relating to plaintiff's injuries was based on his actual experience and knowledge.

Appeal from District Court, Tarrant County; H. S. Lattimore, Judge.

Suit by Betty Bryan against the Northern Texas Traction Company. Judgment for plaintiff, and defendant appealed to Court of Civil Appeals, which certified questions to Commission of Appeals. Affirmed in conformity to answers to certified questions. 294 S. W. 527.

Cantey, Hanger & McMahon, Alfred McKnight, W. D. Smith, and E. A. McCord, all of Fort Worth, for appellant.

Jones, Buck & Gibson, of Fort Worth, for appellee.

CONNER, C. J. This suit was instituted in the Ninety-Sixth judicial district court of Tarrant county by appellee, Betty Bryan, against the appellant, Northern Texas Traction Company, to recover damages for personal injuries alleged by her to have been sustained on December 26, 1923, at or about 8 o'clock p. m., at which time plaintiff was struck by one of the defendant's street cars while plaintiff was attempting to cross the street at the intersection of Main and Sixth streets in the city of Fort Worth.

Plaintiff alleged, in substance, that on said date she had started across from the east side of Main street to the west side, and along the north side of Sixth street, and that, while upon and near the defendant's track, she was struck by one of the defendant's street cars, and thrown against and under the same in such manner as to cause her certain personal injuries, which are set forth at great length in her petition.

The grounds of negligence alleged by the plaintiff were, in substance, that the motorman in charge of defendant's street car operated the same at a high, reckless, and excessive rate of speed; that he failed to exercise ordinary care to keep a reasonable lookout; that he failed to give any signal or warning of the approach of the street car on and over the intersection of Sixth and Main streets, in violation of the ordinances of the city of Fort Worth; that he failed to ring a bell or sound a warning of any kind, as the street car approached the plaintiff on the occasion in question; that defendant failed to provide the street car with brakes in good working condition, for checking the speed thereof; that defendant failed to provide and maintain a guard or rail at and near the front of said street car to prevent persons struck from being thrown under the car; and that the operator in charge of said street car failed to use the means at hand to stop the car after he discovered the peril of the plaintiff, and that the defendant was guilty of negligence in having only one employee in charge of said car.

Defendant, after a general denial, alleged contributory negligence upon the part of the plaintiff in violating title 7, c. 1, § 44, of the Revised Ordinances of the city of Fort Worth, requiring pedestrians to cross at right angles with the curb line, alleging that the plaintiff was not crossing at right angles on the occasion in question, but was guilty of what is ordinarily known as "jay walking;" that plaintiff was further guilty of negligence in attempting to cross Main street north of the intersection of Sixth and Main streets, in violation of chapter 1, title 7, § 48, of the Revised Ordinances of the city of Fort Worth, providing that no person shall cross any street other than at the intersection of two streets; and that the plaintiff was further guilty of negligence in stepping suddenly from in front of a north-bound automobile and into the northeast corner of the street car; and that she was further guilty of negligence in failing to look and listen for the approach of a street car before stepping on to defendant's track, and before attempting to cross said track.

The case was tried before a jury, and the court, upon the verdict of the jury in answer to special issues submitted to them, and which will be hereinafter set out, entered a judgment in favor of the plaintiff for the sum of $20,500. From this judgment the defendant has duly prosecuted this appeal.

The record discloses that the defendant upon the trial formally presented 17 special exceptions to plaintiff's pleadings, a motion to discharge the jury panel, 43 exceptions to the court's charge and issues submitted, requested the presentation of 29 special instructions, 14 requested issues, reserved 45 bills of ex-

---

☜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ceptions, a motion to withdraw certain evidence, extended original and amended motions for new trial, and other motions and proceedings upon which the case is presented in this court upon 78 propositions based upon 96 assignments of error predicated upon the court's rulings on the various proceedings above mentioned, in a brief containing 471 pages, citing numerous authorities. It is thus manifest that we are presented with the difficulty of disposing of all of the questions presented in an opinion of permissible length. We therefore feel forced to adopt the course of presenting our conclusions upon numerous questions presented in a very general way, as unsatisfactory as that may be.

The charge of the court, together with the issues submitted and the answers of the jury thereon, are as follows:

"Gentlemen of the Jury: This case is submitted to you upon special issues, each of which you will answer only by the unanimous consent of all the jury. To aid you I give you the following definitions:

"Negligence is a failure to use ordinary care.

"Ordinary care is such care as a person of ordinary prudence would exercise under the same or similar circumstances.

"Contributory negligence is such an act or omission amounting to the want of ordinary care on the part of plaintiff, as that concurring or co-operating with negligence on the part of the defendant is the proximate cause or the proximately contributing cause of the injury complained of.

"Proximate cause is that cause which, in a natural and continuous sequence, unbroken by any new independent cause, produces the event complained of, and without which that event would not have occurred, and to be the proximate cause of an event it must have been reasonably anticipated by a person of ordinary prudence that the injury or some similar injury would occur. There may be more than one proximate cause of an event.

"An unavoidable accident is one that is not due to the negligence of the party sought to be charged therewith, and is of such a nature that it could not be reasonably anticipated by the parties thereto.

"Now, bearing in mind the foregoing instructions, please answer:

"(1) Was the operation of defendant's car at the rate of speed at which same was going on the occasion on which plaintiff was struck by said car negligence as that term is defined to you? Ans. Yes.

"(2) If you answer No. 1 'No,' do not answer No. 2, but, if you answer it 'Yes,' then answer: Was said operation of said car at said rate of speed a proximate cause, as that term is defined to you, of said car striking plaintiff? Ans. Yes.

"(3) On the occasion at which defendant's car struck plaintiff, was the operator of defendant's car keeping such a lookout as would have been kept by a person of ordinary prudence to avoid injuring pedestrians situated as was the plaintiff? Ans. No.

"(4) If you have answered No. 3 'Yes,' do not answer No. 4, but, if you have answered it 'No,' then answer: Was the failure to keep such lookout, if any such failure you have found, a proximate cause of the car striking plaintiff? Ans. Yes.

"(5) On the occasion at which defendant's car struck plaintiff, did defendant's operator of said car use ordinary care to sound his gong in such a manner as to give a sufficient warning to pedestrians of its approach? Ans. No.

"(6) If you have answered No. 5 'Yes,' do not answer No. 6, but, if you have answered it 'No,' then answer: Was such failure, if any you have found in answering No. 5, a proximate cause, as that term is defined to you, of the defendant's car striking plaintiff? Ans. Yes.

"(7) As soon as the defendant's car operator discovered, if he did, the perilous position of plaintiff, if any such there was, did said operator use ordinary care to use all means at his command to avoid injuring plaintiff, as could be reasonably exercised consistent with his own safety and those on his car? Ans. No.

"(8) If you have answered No. 7 'Yes,' do not answer No. 8, but, if you have answered it 'No,' then answer: Was the failure to use such means, if any such failure you have found in answering No. 7, a proximate cause, as that term is defined to you, of defendant's car striking plaintiff? Ans. Yes.

"(9) At the time defendant's car struck plaintiff, was plaintiff crossing Main street at right angles with the curb line of said Main street and at the intersection of Sixth and Main at the usual place where the pedestrians cross the same? Ans. Yes.

"(10) If you have answered No. 9 'Yes,' do not answer No. 10, but, if you answered it 'No,' then answer: Was the plaintiff crossing Main street at the place at which she did cross same a proximate cause or a proximately contributing cause of her being struck by defendant's car? Ans. Yes.

"(11) In crossing Main street, was plaintiff keeping such a lookout for approaching street cars as a person of ordinary prudence would have kept under similar circumstances? Ans. Yes.

"(12) If you have answered No. 11 'Yes,' do not answer No. 12, but, if you have answered it 'No,' then answer: Was plaintiff's failure to keep such lookout, if any such failure you have found in answering No. 11, a proximate cause, or a proximately contributing cause, of plaintiff being struck by defendant's car? Ans. ——.

"(13) In crossing Main street on the occasion when plaintiff was struck, was plaintiff using such diligence in listening for approaching street cars as a person of ordinary prudence would have used under similar circumstances? Ans. Yes.

"(14) If you have answered No. 13 'Yes,' do not answer No. 14, but, if you have answered it 'No,' then answer: Was the failure to use such diligence, if any such you have found in answer to No. 13, a proximate cause, or a proximately contributing cause, to plaintiff's being struck by defendant's car? Ans. ——.

"(15) Was the striking of plaintiff by defendant's car an unavoidable accident, as that term is defined to you? Ans. No.

"(16) If you have answered No. 10 or 12 or 14 or 15 'Yes,' you need not answer No. 16, unless you have answered No. 7 'Yes,' but, if you have not so answered, then answer: What sum, if paid now in cash, will fairly and reasonably

compensate plaintiff for the injuries, if any there were, sustained by her, of which being struck by defendant's car was the proximate cause? Ans. $20,500.

"In answering this question, you may only take into consideration any physical and mental suffering which you may find under the instructions of this court that the plaintiff has endured to this date, if any, the loss of earning capacity or earnings, if any, as well as any physical pain and suffering, mental pain and suffering, loss of earning capacity, or any of them in the future, if any, each or all or none of which you may find according as you believe from the preponderance of the evidence, but as to each of these items you will allow only such as you believe, if any, the striking of plaintiff by defendant's car to have been the proximate cause of. You may not consider, and you will not refer to, expenses of litigation in any way.

"The burden of proof is upon plaintiff to establish by a preponderance of the evidence the affirmative of No. 1 and 2 and the negative of No. 3, and the affirmative of No. 4 and the negative of No. 5, the affirmative of No. 6, the negative of No. 7, the affirmative of No. 8, and the negative of No. 15, and the answer to No. 16.

"The burden of proof is upon the defendant to establish by a preponderance of the evidence the negative of No. 9, the affirmative of No. 12, the negative of No. 13, and the affirmative of No. 14, but in making your answers you may consider all the evidence adduced in this cause.

"You are the exclusive judges of the credibility of the witnesses and of the weight to be given their testimony and of the facts proved, but you receive the law from the court as embodied in this charge and will be governed thereby.

"You are instructed that you may consider the testimony of the witness Harry Hamilton for the purpose of determining the extent of the injuries of Miss Bryan and their effect upon her, and his and her own credibility, and for no other purpose.

"You are instructed that during the progress of this case it has developed that it has been tried at a previous term of court, and that you must not ascertain or attempt to ascertain, discuss, or consider the result of that trial, as the same has no bearing whatever on the case.

"You are instructed that the testimony of the witness Mrs. Kreyembuhl, given at a former trial of this case which was introduced in evidence, may be considered by you for the sole purpose of passing upon her credibility as a witness, and for no other purpose whatever.

"In arriving at your answers, you are instructed that you will only consider the facts pertinent to the issues submitted to you in this charge, and that all other evidence and allegations are especially withdrawn from your consideration."

[1] The defendant's exception to the action of the court in overruling its motion to quash the panel of the jury, on the ground that it had not been selected from the tax list in the tax assessor's office for the current year, as provided by articles 2094 and 2095, Rev. Statutes, applicable to cities such as Fort Worth, containing a population aggregating 20,000 inhabitants or more, must be overruled in accordance with the opinion of the Supreme Court upon the question involved, which we certified to them.

[2, 3] The allegations in the plaintiff's petition, to the effect that the street car in question was being operated at "a high and dangerous rate of speed," and that defendant negligently failed to provide and maintain in good working condition on said street car the "brakes or other device for retarding and checking the speed thereof," are sufficiently specific, and hence not subject to the objection that they are too "uncertain and indefinite." The objection to the allegation that there was but one employee on the street car, on the ground that it was wholly immaterial, inasmuch as no ground of negligence in this respect was submitted to the jury, and the court in its charge specifically instructed the jury to "only consider the facts pertinent to the issues submitted to you in this charge, and that all other evidence and allegations are especially withdrawn from your consideration."

Propositions 7, 8, 8a, and 9 are accordingly overruled.

[4, 5] Objection was made to the introduction of the ordinance 421 of the city of Fort Worth, providing that drivers of motor driven vehicles and street cars shall, when approaching a crossing or rounding a curve or corner on a public street, make such signal as may be necessary to give proper warning to other vehicles or pedestrians of their approach, is unconstitutional and illegal, in that it is too general, remote, speculative, and indefinite. Proposition 10 presenting this objection will be overruled, regardless of the constitutionality of the ordinance, which we do not determine, for the reason that the ordinance was not submitted to the jury in the court's charge, and it should be admitted that at least ordinary care must be exercised by the operatives of motor vehicles and street cars to avoid injury to persons lawfully upon the streets of the city, and a want of the exercise of such care which proximately results in injury constitutes negligence, and the question in this case was so presented to the jury. Propositions 10, 11, 12, and 12a are accordingly overruled.

[6] Special issue No. 5 of the court's charge was objected to on the ground that the pleading was insufficient to support the submission of the issue; that it was on the weight of the evidence, suggested the fact that plaintiff was struck where pedestrians usually cross the street, whereas under the defendant's answer it was pleaded that the plaintiff at the time was "jay walking," and there was evidence to support such theory; that the charge was vague and indefinite, and left to the jury to speculate as to what would be a sufficient warning, in that there was no evidence that defendant's street car on the occasion in question was being operated at a negligent, high, reckless, and excessive rate

of speed, thus affording the jury an opportunity to determine that the operation of the car under the circumstances and at the rate of speed it was being operated constituted negligence, even though they might think that such car was not being operated at the rate of speed alleged. These propositions have been carefully examined, but we think without repeating the evidence that it undoubtedly raised the issue and supported the issue as presented in the plaintiff's pleadings, and that the other objections, such as being upon the weight of the testimony, indefinite, suggestive, etc., are without merit. Propositions 13, 14, 15, 16, and 17 are accordingly overruled.

[7] Special issue No. 1 was also excepted to on similar grounds, all of which we think untenable. As indicated, the evidence raised the issue of excessive rate of speed. Among other things, the plaintiff testified that:

"If I had looked to my left at any time after I got within two or three steps of the street car track, I could not have seen that street car, because it was coming too fast. It was not coming so fast that I could not see it, but it was too far down. * * * As to what kept me from seeing it, it wasn't there, or was coming so fast I didn't see it. I did not get on the track and look down to the depot. I looked half a block away or something like that, and a man going 20 miles an hour can get up on you in a few minutes."

The witness McDaniel testified on direct examination that:

"I am familiar with the sound of a street 'car motor when it is gathering speed. As to how I would compare this sound that I heard with that kind of a sound, I would say that it sounded like he was gathering speed all of the time, grinding and picking up speed, a sort of a grind.
"Yes; I have had occasion to observe the speed of street cars and automobiles going back and forth in the streets of Fort Worth, and I have driven an automobile a good deal. In my opinion, the street car, at and just prior to the time that it struck Miss Bryan, was going between 10 and 15 miles an hour. That speed was not retarded any before it struck her."

On redirect examination this witness had his memory refreshed in the following manner:

"Yes; I was a witness on the trial of this case some six or eight months ago, and the matter was fresher in my memory then than it is now. I gave the facts connected with the case as I understood them at that time.
"Q. At what approximate rate of speed? A. About 20 miles an hour.
"Q. Do you remember to have made that answer? A. I don't remember just the answer.
"Q. State whether or not that is a correct statement of your testimony on the other trial. A. Yes, sir.
"Q. With your memory thus refreshed about your testimony at the former trial, what do you now say about the rate of speed the car was traveling? A. About the rate of speed?
"Q. Yes. A. From the first time I seen the street car?
"Q. Yes. A. Well, it was the first time I seen it, I guess it was running 20 miles an hour."

On cross-examination this witness further testified:

"Q. You said a while ago you thought after Mr. Jones read you your testimony on the other trial that you thought when you first saw the street car that it was running 20 miles an hour? A. Yes, sir; the car didn't slacken its speed before the accident.
"Q. Then you say now it wasn't going but 10 miles an hour? A. No; it was not going that slow."

There was also evidence to the effect that the traffic was heavy at the time of the injury, as will be seen from the following quotation from the testimony of plaintiff:

"I said that there was heavy traffic on the street, and I mean by that that there were automobiles going both ways and street cars, of course. There were also people who were either crossing Sixth street or Main street there; there were people passing on foot, people walking back and forth."

Propositions 18, 19, 20, and 21 are accordingly overruled.

[8] Objection was presented to special issue No. 3 of the court's charge as multifarious, on the weight of the evidence, placed too great a burden upon defendant when it was a sharply disputed issue on the question of where pedestrians were supposed to walk on the occasion in question; that there was no pleading to support the issue as submitted. Special issue No. 4 was also objected to on the ground that it was suggestive. We think there is no merit in the objections to issues 3 and 4.

It was alleged that:

"He (the motorman) negligently ran the car upon plaintiff without keeping a lookout and stopping same or reducing the speed thereof; and negligently failed to keep a lookout for plaintiff; and negligently failed to use ordinary care or any care whatever to keep a reasonable lookout as it was his duty to do and kept no lookout whatever."

The testimony has been examined, and, while the evidence is conflicting, it undoubtedly required the submission of the issues, and is sufficient to support them. Propositions 22, 23, 24, 25, and 26 are accordingly overruled.

[9] A number of assignments and propositions are based upon objections to issue No. 7, submitting the question of discovered peril. It is insisted that there was no evidence raising the issue; that the issue was duplicitous; that it was on the weight of the evidence, in that it assumed that the operator of defendant's car did discover the perilous

position of plaintiff, and assumed that the operator could have avoided injuring the plaintiff after discovering her. These propositions have been carefully examined, and, while the evidence is possibly not very satisfactory in support of the issue that the operator of the car discovered plaintiff in time to have avoided injuring her by the use of the instrumentalities at his command, we nevertheless think the errors suggested, if any, are not such as to require a reversal of this case. Main street in the city of Fort Worth extends north and south, and Sixth street crosses it at right angles. The operator of the street car testified, among other things, that he was going north, and that he did not stop his car at the intersection of the south line of Sixth street with Main street, for the reason that there was no one to get on or off the car at that place; that he did not see a crowd of people at the northeast corner of Sixth street as he started to cross it; that he was looking straight ahead; that as he approached the south line of Sixth Street he slowed up the car, and then speeded it up to about 10 miles an hour, and then crossed Sixth street; that he had crossed the place on Sixth street where pedestrians ordinarily crossed from one side to the other before the accident happened. He said:

"I saw the plaintiff, the lady who was struck, before the accident. Yes; there were quite a number of automobiles in the street there at that time. I would say that the traffic was rather crowded at that time. There were automobiles to the right of my street car, going in the same direction that I was going. There were quite a number of automobiles on the street. I could not say how many. * * * When I first saw her, she (the plaintiff) was about two or three feet from the track, and I was about ten or twelve feet from her. She was east of the track. She was two or three feet east of the track. She seemed to me to come from behind some automobiles or in front of them, whichever you call it. It was behind it to me. * * * She seemed to be just walking along with her head down, looking toward the ground at that time. She was walking west. * * * When I saw her walking west within two or three feet of the east rail of my car track, I put the car in emergency at once, and stepped on the gong. * * * I had air brakes on the car I was operating, and I mean by that that it had brake wheels which were operated by air. When you throw it in emergency that locks the wheels of the car. * * *

"Q. Did she continue to walk west any further than she was when you first saw her? A. She taken a step is about all, I guess. If she had stopped where I saw her, within two or three feet of the track, my street car would have cleared her as I went on north. She did not stop; she took another step, and that put her over the east rail of the street car track, placing her in front of the northeast corner of the car. * * * After I struck the woman with the street car, the street car went 2 or 3 feet or so. She was caught under the car. She fell. She fell with her head east. The lower part of her body was under the car, and her head and the upper part

of her body was out. She was under the door, under the fender. She was under the east front door. * * * I did all in my power to stop the street car, after I saw the woman approaching the track there within 2 or 3 feet of the track, before she stepped into the corner of the street car. As to where the accident happened, with reference to the north line of Sixth street, I will say that I stepped off 16 steps, about 48 feet from the north line."

Clarence McDaniel testified that he witnessed the accident, and knew where the north line of Sixth street crossed Main street; that when the car struck the plaintiff she was about the middle of the line that goes across the street. He further testified:

"If the sidewalk along the north side of Sixth street extended across Main street, this person that was struck would be about the center of it. * * * The first thing that I heard was the grind of the street car. It was just a few seconds after that until I saw the person struck. The person that was struck was going west across the street. I then heard the impact of the collision, and I heard the lady holler. I heard her scream just before the car hit her. * * * Prior to the time the street car struck her, there was no gong or bell or signal. I did not hear any gong or signal rung. * * * The street car traveled, in my opinion, from the time I saw it until it struck Miss Bryan, 20 feet, I guess. * * * At and just prior to the time that it struck Miss Bryan, the street car was going between 10 and 15 miles an hour. That speed was not retarded any before it struck her."

[10] On cross-examination, after having his memory refreshed by evidence given by him on a former trial, he stated that at the time he first saw the street car it was going "about 20 miles an hour." Without culling the statements of the various witnesses, we think it sufficient to say that there was other testimony tending to show that the street car when stopped was some 40 feet north of the north line of Sixth street; and there was also evidence tending to show that a street car, upon the application of the emergency brakes, running at the rate of speed the operator says he was running, could have been stopped after he saw the plaintiff in time to have avoided striking her. It is to be further observed in this connection that the court did not, in direct terms, submit the issue of discovered peril. The issue simply was whether the operator of the car used all the means at his command to avoid injuring the plaintiff after he saw her, and the court in express terms directed the jury to disregard all evidence and allegations not relating to the issues submitted. Moreover, if it be assumed that the evidence did not raise the issue of discovered peril, it is well settled under our decisions that, if the judgment is sustained upon other issues of negligence entitling a plaintiff to recover, which we think is true in this case, the error would be immaterial. We accordingly think we should overrule propositions 28, 29, 30, 31, 32, and 33.

[11] We overrule the contention that special issue No. 9 is on the weight of the evidence, in that it suggested to the jury that plaintiff was not crossing the intersection of Sixth and Main streets at the usual place and at right angles with the curb. The testimony may be said to be conflicting on this issue, but the evidence abundantly supports plaintiff's allegation that she was crossing the street at the usual place where pedestrians cross the same.

[12] Special issue No. 11 was objected to on the ground that it did not require the jury to find whether plaintiff looked for a street car at the time or immediately prior to the time of stepping upon the track, and that the issue was suggestive and on the weight of the testimony, and that defendant's specially requested issue No. 3 should have been given inquiring whether the plaintiff failed to look for the street car in question "just prior to stepping on the street car track."

The plaintiff testified, among other things, that:

"I was traveling where every one else was crossing. I had been crossing the street there for six months. When I got on to the street car track, I was struck by a street car, when I was in the middle or near the west rail. I first saw the street car when I was going down; that is, after it struck me. I had not heard it before that time. I hadn't heard it. I had not heard any gong or bell from that side of me. There was no bell or gong sounded."

On cross-examination, after having testified that it was about 8 o'clock at night, that the street and sidewalk were dry, and that the street was crowded, and that just after stepping onto Sixth street, she stepped back a step to be clear from an automobile going north, after which she proceeded across the street, meeting several crossing in the opposite direction, the plaintiff said:

"I had a clear view from Sixth street, and, when I started across I looked. I looked several times, and the last time I glanced I was within two or three steps of the street car track, perhaps not that far. Yes; I looked several times; I looked south. I looked down the street car track. I also looked in the other direction, and I then looked back south again. I don't know how many times I did look, but I looked several times. I looked to the south two or three times, and didn't see anything coming. I didn't see any street car coming, and then, when I got in three or four steps of the track, I took my last glance to the south. As to why I didn't look any more to the south after that, I will say I made sure if there was a street car coming or anything coming they would warn me, and I was right at the track, within two or three steps of the track. I was within two or three steps of the track when I looked to the left, which would be south, the last time. I went on from there west without looking to the south any more. Yes; I knew I was coming to the street car track. * * * I knew that street cars went up that street over that track every two or three minutes at that time of night. * * * You ask me why I

didn't look to the left again after I passed within two or three steps of the track. I thought sure if a street car was coming it would ring its bell, and I would hear it, and the streets were crowded, and any one would have to pick their way to get across the street.

"Q. Tell the jury why it was when you started across that street you could see an automobile to your left, which you saw might hit you, and stepped out of its way, and yet you go right on in the middle of the street, and could not see as big a thing as a street car, and step right in the path of it and be knocked down by it. A. Why was it the motorman was running about 20 miles an hour? And going that fast, any one can get over a lot of ground. The motorman was speeding that night. * * * The street car was running at least 20 miles an hour, and probably more, and it got over a lot of ground, and I looked and didn't see it. It was on me before I could see it. If I had looked to my left at any time after I got within two or three steps of that street car track, I could not have seen that street car, because it was coming too fast. It was not coming so fast that I could not see it, but it was too far down. * * * I looked half a block away or something like that, and a man going 20 miles an hour can get up on you in a few minutes.

"Q. Don't you know if you had looked down the track you could have seen it? A. I looked.

"Q. You didn't look when you stepped on the rail. A. No; not on the rail. I looked when I was within a step or two of the rail, I looked south to see if anything was coming. I thought if there was a street car coming, it would certainly warn me, and I did not know they would come that fast."

[13] We are of the opinion that there was no occasion for the submission of special issue No. 3, inasmuch as plaintiff admitted that she did not look south at the moment she stepped over the east rail of the car track, and we think the issue as submitted was not subject to the objections urged against it. Propositions 35 to 38, inclusive, are accordingly overruled.

Similar objections are urged against the court's special issue No. 13, but these objections are overruled for reasons similar to those assigned by us in overruling propositions 35 to 38, inclusive. Appellant's propositions 39, 40, and 41 are accordingly overruled.

[14] The introductory instructions given by the court in connection with special issue No. 16, which issue asks the jury to find the amount of damages suffered by the plaintiff, is objected to on the ground that it was on the weight of the evidence, and in effect instructed the jury as to the effect of their verdict. The introductory statement objected to is as follows:

"If you have answered No. 10 or 12 or 14 or 15 'Yes,' you need not answer No. 16, unless you have answered No. 7 'Yes,' but, if you have not so answered, then answer."

We think this objection is wholly without merit. The evidence to which we shall hereinafter have occasion to refer was that the

jury had answered issues Nos. 7, 10, 12, 14, and 15 before they came to, and considered, issue No. 16 relating to the amount of damages, and the court's charge evidently was framed with a view of enabling the jury to avoid the necessity of considering the amount of damages, in event the facts had been found as indicated by the charge. The record discloses that the jury had much difficulty in determining the issue of damages, and the propriety of giving such introductory statement is thus well illustrated in this case. Proposition No. 42 is accordingly overruled.

[15, 16] We find no reversible error in the court limiting the effect of the testimony of Mrs. Kreyenbuhl and Harry Hamilton; nor in the court's general instruction to the jury that:

"In arriving at your answers, you are instructed that you will only consider the facts pertinent to the issues submitted to you in this charge, and that all other evidence and allegations are especially withdrawn from your consideration."

Propositions 43 to 46, inclusive, are accordingly overruled.

[17] A more difficult question, perhaps, is presented in the 189th and 196th grounds of appellant's amended motion for a new trial, upon which is predicated propositions 47 to 52, inclusive. Complaint is made under these several propositions of misconduct on the part of the jury, in that during the deliberations, and while considering the 16th issue submitted by the court relating to the amount plaintiff had been damaged, the jurors discussed and considered the amount of hospital fees and doctors' bills which the plaintiff had paid or had become obligated to pay; the amount assessed by a former jury; and the cost to her for buying a home. The evidence heard by the court upon the motion for new trial relating to the alleged fact that the jurors considered the amount allowed by a former jury is not of sufficient weight, we think, to justify us in quoting the testimony. There was, however, considerable evidence to the effect that during the deliberations of the jury the probable cost to plaintiff of her hospital and doctors' bills, and the amount that she would probably be compelled to pay her attorneys, or to procure a home, was, in a general way, discussed and considered, at least by the juror Snow.

In the wisdom of the common law it was regarded as against public policy to receive the testimony of a juror to impeach the verdict of a jury after it had been duly returned and received in open court, and the decisions of our own courts from an early day until the enactment of the law hereinafter quoted adhered to the rule of the common law. See Campbell v. Skidmore, 1 Tex. 475; Mason v. Russel's Heirs, 1 Tex. 721; Boetge v. Landa, 22 Tex. 105; Ellis v. Ponton, 32 Tex. 435; St. Louis S. W. Ry. Co. v. Ricketts, 96 Tex. 68, 70 S. W. 315.

As illustrating the view expressed in the above cases, we quote the following from the case of Boetge v. Landa, supra, in which a new trial was sought on the ground that one of the jurors had been coerced into the verdict:

"The jury were again polled, and the juror Bernhard. declared that the verdict was his verdict. We think that a verdict returned into court, and received by the court under such circumstances, cannot be set aside on the ground that one of the jurors had been coerced into assenting to it. The juror had been called on by the court to declare whether or not he assented to the verdict. If he had been under any restraint while in the jury room, he should have disclosed the fact, when solemnly called on, in open court, to say whether or not the verdict returned was his verdict. He was then under the protection of the court, and under the most solemn obligation to answer truly. We cannot conceive that any but unworthy motives could influence a man to declare solemnly in open court, that he had assented to a verdict, and then to proclaim on the corners of the streets that he had been intimidated and coerced into an assent to the verdict. The judge below ought not to have given audience to the affidavit of the juror under such circumstances, and might properly have punished his contemptuous trifling with the time and authority of the court."

In 1905, however, our Legislature enacted the following law relating to motions for new trial:

"That title 30, chapter 17, article 1371, Revised Civil Statutes of Texas be so amended as to read as follows:

"Art. 1371. Every such motion shall be in writing and signed by the party or his attorney, and shall specify the ground upon which it is founded, and may be amended under leave of the court, and no grounds other than those specified shall be heard or considered. Where the ground of the motion is on account of misconduct of the jury or the officer in charge or because of any communication made to the jury, or because the jury received other testimony the court shall hear evidence thereof, and it shall be competent to prove such facts by the jurors or others, by examination in open court; and if the misconduct proven, or the testimony received, or the communication made be material a new trial may in the discretion of the court be granted." Gen. Laws 1905, c. 18, p. 21.

After this enactment, our courts have held that the testimony of a juror is receivable in open court to impeach a verdict, and that, if the court finds that the verdict of a single juror was influenced in a material matter by some extraneous matter or unauthorized communication, the verdict should be set aside and a new trial granted. Foley v. Northrup. 47 Tex. Civ. App. 277, 105 S. W. 229; Missouri K. & T. Ry. Co. v. Hawkins, 50 Tex. Civ. App. 128, 109 S. W. 221; St. Louis Southwestern Ry. Co. v. Roberts (Tex. Civ. App.) 196 S. W. 1004; Crystal Palace Co. v. Roempke (Tex. Civ. App.) 227 S. W. 230.

The testimony relating to the subject is

contained in a bill of exception, and covers 43 pages of the transcript, entirely too long to quote. It has been considered, however, and we think its substance is to the effect, that the jury in their deliberations determined all issues of liability before they arrived at issue No. 16, relating to the subject of damages. Mr. Snow was first elected foreman, but later excused, and a Mr. Burgess elected, on the ground, as stated by Snow, that he was handicapped in a way by not being educated, and could not read very well, etc.; that, during the early discussions relating to the amounts of damages, the amounts that plaintiff would probably be required to pay her attorneys and for doctors and hospital bills were discussed and considered, but that later the juror Snow read the charge, and for the first time noted that the court had charged the jury "that they were not to consider hospital bills, lawyers' fees, and doctors' bills"; that, after reading this charge, Snow handed it to the foreman Burgess, and he then read it to the jury, and the foreman explained to them that they must not discuss attorneys' fees, hospital bills, and doctors' bills; and that "they could not allow anything for that, and they ought not to discuss it; that the court had said that in plain language."

He further stated that Judge Lattimore told them that they were improper matters, and his charge said in plain words, "You must not consider these things in making up your verdict"; that he knew they ought not to be discussed in there, and tried to keep them from discussing those matters, as the charge said you must not consider them, and that was what they were to go by; that he had taken an oath to try the case according to the evidence; that his (Snow's) real judgment of what the plaintiff ought to have was $15,000, but he was influenced to increase the amount by the criticism of a German on the jury who referred to his as a "hip pocket play," which made him mad; that at the time he voted for $15,000 or $16,000 ten of the jurors had agreed on $25,000, one other man was for $30,000 or $40,000; that upon the return of the verdict into court he did not remember whether the jurors were asked questions except that he thought that the court did ask if "we all agreed upon that amount."

Mr. Burgess, the foreman, testified that, when the juror Snow "called our attention to the fact that in the charge we were specifically charged not to consider or take into consideration any expenses incurred by either party in the trial of the case in the way of lawyers' fees, doctors' bills or anything else of that character, as he read the charge throughout, from that time on we didn't. It had been discussed up to that time; that the subject might have been later mentioned by one of the other jurors a number of times, but on each instance this specific charge of

the judge was set over against it immediately. Whoever might have brought it up was cautioned by the fact that they were specifically barred from considering those things. It was not to enter into the final verdict of the jury at all."

Mr. Buck, of counsel for plaintiff, testified, in substance, that on the next day after the verdict was returned he went to see Mr. Snow with a view of ascertaining whether there had been any misconduct of the jury during their deliberations; that he interrogated Snow about what had occurred in the jury room with reference to attorneys' fees and doctors' bills, and the evidence that was considered in the case, in fact, everything that he could think of that would be improper conduct; and that he had an affidavit that he wanted Snow to sign, to the effect that there was no discussion of attorneys' fees, but Snow said he could not sign that because there was a discusssion of that; that Snow said, however, that:

"I personally called the jurors' attention to the fact that the court had instructed them that they could not allow anything for attorneys' fees, doctors' bills, and cost of litigation, or hospital bills, and that he afterwards handed the charge over to Duke Burgess, who was the foreman, and he read it out to them. He said that he could not speak for anybody but himself, because he did not know what was in the other jurors' minds. * * * He (Buck) asked him if he personally thought she got more money than she was entitled to under the court's charge, and he said he did not; that he came up to $20,000 gradually, $5,000 at a time, and finally reached the verdict of $20,500 by him coming up $500 more and Cordy (the high man) coming down $500. He said, so far as he was concerned, he did not allow her anything for attorneys' fees; he said this, as I (Buck) recall it, that either he or somebody remarked, whatever she did with her money after she got it was her affair, and not theirs; that they were only going to allow her for her suffering, and the loss of earning power."

While the testimony of Snow tends to show that he was influenced to some extent at least to increase his verdict from $15,000, to which he said he believed the plaintiff was entitled, to $20,500 by an insult, as he claimed, by one of the jurors, by an anxiety to hasten his discharge, and by the consideration of the attorneys' fees and hospital and doctors' bills, yet he was flatly contradicted by Mr. Buck in a material matter, and also by the foreman Burgess on a minor point. The other eleven jurors signed an affidavit to the effect that the matters complained of were not considered, and the court so found informal written conclusions made a part of the record. The evidence shows that plaintiff was undoubtedly seriously and permanently injured, and has suffered great pain, and appellant has not questioned the sufficiency of the evidence to support the verdict on the material issues

of liability, or complained of the verdict as excessive.

The statute declares that:

"If the misconduct proven, or the testimony received, or the communication made be material, a new trial may, in the discretion of the court, be granted."

It thus appears that, by the express terms of the statutes, the matter of granting a new trial on the ground of misconduct of the jury was committed to the discretion of the court. And it has been more than once so decided. This court, in the case of Kaker v. Parrish (Tex. Civ. App.) 187 S. W. 517 (writ of error denied), had occasion to consider the question and to say that:

" * * * It is to be remembered that our statute (Vernon's Sayles' Texas Civil Statutes, art. 2021) which authorizes a consideration of the testimony of jurors for the purpose of impeaching their verdict is contrary to the rule of the common law, and hence that a litigant so asking to disturb a verdict against him has the burden of showing, not only that the matters of which he complains amount to misconduct on the part of the jury, but also that the same operated to his prejudice. San Antonio Traction Co. v. Cassanova [Tex. Civ. App.] 154 S. W. 1190, and cases therein cited. It is also to be remembered that the statute expressly commits the determination of such questions to the 'discretion' of the trial court, and, while such discretion is reviewable on appeal, his action in overruling the motion for a new trial on the ground of misconduct of the jury will not be disturbed when it seems that the trial judge acted fairly in the investigation. See Railway Co. v. Gray, 105 Tex. 42, 143 S. W. 606."

See, also, Kalteyer v. Mitchell (Tex. Civ. App.) 110 S. W. 462; Id., 102 Tex. 390, 117 S. W. 792, 132 Am. St. Rep. 889.

While this court undoubtedly has the power to review the discretion assumed by the trial court, we have concluded that in the instance before us the court had before it the juror Snow, heard his testimony and that of the other witnesses, and we feel unable to say, under the circumstances, that the court abused his discretion in refusing to grant the new trial. Appellant's propositions 47 to 52, inclusive, are accordingly overruled.

[18, 19] During the trial the witness Clarence McDaniel testified on direct examination in behalf of plaintiff that the street car on the occasion in question was going about 10 or 15 miles an hour just prior to the time it struck the plaintiff. To refresh his memory, this witness' testimony on a former trial was exhibited, in which he had stated that the car at the time mentioned was traveling about 20 miles an hour up to the time it struck Miss Bryan. After his memory was so refreshed, he stated that his former evidence that the approximate rate of speed was about 20 miles an hour was correct. We think there was no error in thus permitting the witness to so state, nor do we think error was committed in permitting the plaintiff to show that a Mr. Meisner, shown to have been present at the time of plaintiff's approach to the Sixth street crossing, was not summoned, for the reason that he was not found by the officer. Propositions 53 to 54 are accordingly overruled.

[20, 21] Plaintiff alleged that, as a direct and proximate result of having been struck and injured, she was seriously and permanently injured, in that several of the transverse processes of the vertebræ of the spinal column were fractured, broken and the ligaments thereof torn, bruised, and displaced, and partially dislocated; that both of her limbs at or near the ankle were fractured, broken, mashed, and mangled; that both hips were fractured, broken, dislocated, bruised, and otherwise injured, and numerous other injuries. Defendant objected to the testimony of Dr. Harold V. Johnson, on the ground that the pleadings did not authorize the doctor's testimony, to the effect that the plaintiff had lost weight. There was further objection to the testimony of Dr. Johnson to the effect that both of plaintiff's ankles were broken. These objections were on the ground that the pleadings did not authorize the testimony. It appears that the plaintiff in a separate paragraph alleged that, after she had been thrown under the car, the motorman opened and pressed upon her the door or steps, and thus injured her ankles. It is contended, in effect, that this injury constituted a separate cause of action, and not supported by the allegations of negligence in operating the car at a negligent rate of speed, or in failing to keep a proper lookout, etc. We think, however, that the act of the motorman in negligently opening the door and inflicting the further injury to plaintiff's ankles, if he did so, was but a part of the occurrence as a whole, and therefore that the proof was admissible. We are of opinion also that the error assigned to the ruling of the court in not permitting defendant to read from "Scudder on Fractures" while examining Dr. Johnson should be overruled. Dr. Johnson, in effect, declined to admit that he recognized the work as authority, and that his opinion relating to the injuries to the plaintiff's feet and ankles was based upon his actual experience and knowledge. Propositions 54 to 78 are overruled, it being our further opinion that the evidence fully supports the material allegations of plaintiff's petition.

The judgment is accordingly affirmed.